Filed 11/30/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE NATIONAL GRANGE OF THE ORDER OF PATRONS OF HUSBANDRY et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> THE CALIFORNIA GUILD et al., <br><br> Defendants and Appellants. | C080523 <br><br> (Super. Ct. No. 34201200130439CUMCGDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Affirmed.

Porter Scott, Martin N. Jensen and Thomas L. Riordan for Plaintiffs and Respondents, The National Grange of the Order of Patrons of Husbandry and Edward L. Luttrell.

Schiff Harden LLP and Jeffrey D. Skinner for Plaintiffs and Respondents California State Grange and Ed Komski.

Ellis Law Group, Mark Ellis and Amanda N. Griffith; Boutin Jones Inc., Robert D. Swanson, Michael E. Chase and Daniel S. Stouder; Krogh & Decker and Derek C. Decker for Defendants and Appellants The California State Grange (now California Guild), Takashi Yogi, Kathy Bergeron and Bill Thomas.

Ellis Law Group, Mark Ellis and Amanda N. Griffith; Krogh & Decker and Derek C. Decker for Defendant and Appellant, Robert McFarland.

1

In this declaratory relief action, the trial court granted summary judgment to the plaintiff, The National Grange of the Order of Patrons of Husbandry (the National Grange), declaring (essentially) that the property that belonged to the California State Grange when the National Grange revoked the California State Grange's charter in 2013 now belongs to a newly chartered California State Grange. On appeal, various defendants -- including the former California State Grange (now known as the California Guild) -- contend the trial court erred. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Viewing the evidence in the light most favorable to defendants (the losing parties) (see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768), the following facts appear.

*The Basic Structure And Laws Of The Grange*

The Order of Patrons of Husbandry is a nationwide fraternal organization that was formed in 1867 to represent the interests of America's farmers.[1] The Order has a multi-tiered, hierarchical structure and representative form of government that is prescribed by its Digest of Laws -- particularly, the Order's constitution and the by-laws of the Order's National Grange.[2] Under the Order's constitution, the Order consists of six divisions, including Junior Granges and Subordinate Granges (which are membership Granges),

---

[1] Although the Order of Patrons of Husbandry is commonly referred to as the Grange, we will refer to it as the Order so as to distinguish the organization as a whole from its divisions, which consist of the National Grange and various constituent granges, including the California State Grange.

[2] As of 2012, the Order's Digest of Laws was made up of "the Constitution of the Order, the Articles of Incorporation and By-Laws of the National Grange; the Codes of Laws of the Various Granges of the Divisions of the Order and the Codes of Laws Regulating the Ritual, Degrees and Regalia, Judiciary and Parliamentary Matters of the Order." The constitution contained in the 2012 Digest of Laws is the Constitution of 1986, which was presumably ratified by the State Granges of the Order that year.

2

Pomona Granges (which are district membership Granges), State Granges (which are state delegate bodies), and the National Grange, which is "the controlling and supreme law making body of the Order from which body all the other Granges of the divisions of the Order . . . derive their rights and powers." The National Grange, which meets annually, is -- pursuant to the National Grange's by-laws -- principally composed of the "Masters" -- i.e., the highest officers -- of the various State Granges.

Under the Order's constitution, the National Grange has "the right and power as the good of the Order requires, to adopt laws for the organization, administration and regulation of the affairs of the various Granges of the divisions of the Order including laws limiting, defining, and regulating the powers of the various Granges of the divisions of the Order." The by-laws of the National Grange further provide that "[t]he Constitution of the Order . . . is the supreme law of the Order and shall be determinative of the rights and duties of the various Granges of the divisions of the Order and members thereof as provided in these By-Laws."

Under the Order's constitution, the National Grange also has the power to "issue all Charters for the various Granges of the divisions of the Order." The procedure for issuing charters is provided for in the National Grange's by-laws. Pursuant to the Order's constitution, "[a]ll Charters issued to the various Granges of the divisions of the Order shall provide that members of each Grange at all times will faithfully comply with the Constitution of the Order, the Articles of Incorporation, By-Laws and Grange Laws and Usage of the various Granges of the divisions of the Order as from time to time adopted."

Pursuant to the National Grange's by-laws, each State Grange is, like the National Grange, a delegate body, except that each State Grange is principally composed of the Masters of active Subordinate and Pomona Granges within the jurisdiction of the State Grange. Thus, for example, the California State Grange is a delegate body that is principally composed of the Masters of active Subordinate and Pomona Granges within the state of California.

3

The California State Grange received its charter from the National Grange in 1873 and participated as a subordinate and constituent part of the Order from that time through 2012. From 1873 until 1946, the California State Grange operated as an unincorporated association. In 1946, the California State Grange reorganized as a nonprofit mutual benefit corporation under California law. The articles of incorporation, which have never been amended, identified a number of purposes for the formation of the corporation, the first of which was "[t]o incorporate and take over the existing unincorporated association known as 'California State Grange.' "[3] The articles further provided that all members of the voluntary association that was the California State Grange were to be members of the corporation and that the constitution and by-laws of the unincorporated association would be and remain the constitution and by-laws of the corporation until amended.

Like the National Grange, the California State Grange's constitution and by-laws are published as part of a Digest of Laws. The version of the California State Grange's constitution from 2011 provided that "[t]he State Grange, as a chartered division of the National Grange, shall have the right and power, as the good of the Order requires, to adopt laws for the organization, administration and regulation of the affairs of the various divisions of the State Grange, including laws limiting, defining, and regulating the powers of the various Granges of the divisions of the State Grange, so long as they do not conflict with the laws of the National Grange." The California State Grange's constitution also provided that "[a]ll candidates for membership and elected officers shall be required to agree at the time of election to membership, or installation in office, that at

_____

[3]      Interestingly, almost all of the remaining purposes identified in the articles of incorporation are similar, if not identical, to the "SPECIFIC OBJECTIVES" set forth in the Declaration of Purposes of the National Grange, which is chapter 2 of the National Grange's Digest of Laws. Although there is no evidence in the record on this point, it appears likely that these additional purposes identified in the articles of incorporation for the California State Grange were drawn directly from an earlier version of the specific objectives in the Declaration of Purposes of the National Grange.

4

all times they will faithfully comply with the Constitution, By-Laws, and Codes of the Grange at all levels, as from time to time adopted."

As relevant here, the California State Grange's by-laws provided that the State Grange shall have "an Executive Committee consisting of the Master and five elected members and the Overseer." The Master, the Overseer, and the five elected members of the Executive Committee are all officers of the California State Grange, and the by-laws provided that "[i]t shall be the duty of the officers of the various Granges of the Order to ensure that the Constitution and By-Laws of the Grange at all levels are observed and obeyed . . . ."

*The Events Leading Up To This Action*

The headquarters of the California State Grange are located on U Street in Sacramento. Record title to the property is in the name of the California State Grange alone.

In October 2009, Robert McFarland was elected to his first term as the California State Grange's Master/President.

In 2010, under section 4.5.7 of the by-laws of the National Grange, the power of the Master of the National Grange to suspend or revoke the charter of a State Grange was limited to situations where the number of Subordinate Granges within the state fell below six. The National Grange's by-laws further provided that a State Grange whose charter was revoked or suspended could appeal that action pursuant to the National Grange's Code of Judicial Law. Also, "[a]s soon as possible after the final determination of revocation of a [State Grange's] Charter," "[a]ll remaining assets owned by such State Grange shall be placed in trust as provided for in Article XII of these By-Laws." Under article XII, "[w]henever a State Grange surrenders its Charter or otherwise becomes Inactive, the net assets of that Grange shall be retained by the Order for use in accordance with the general purposes of the Order, subject to the following terms and conditions: [¶] (A) All right, title and interest as to all real and personal property owned by a State

5

Grange which surrenders its Charter or otherwise becomes Inactive shall become the Property of the National Grange. The National Grange shall hold such property in trust for the benefit of the Inactive State Grange until said State Grange is reorganized pursuant to Grange Law."

At the annual convention of the National Grange in November 2010, an amendment to the National Grange's by-laws was proposed to expand the National Master's power to suspend or revoke the charter of a State Grange, allowing the National Master to take that action in various situations, including when "the State Grange is working in violation of the law and usages of the Order." The first vote on this amendment was taken at the 2010 national convention; the California delegation voted against the amendment at that time.

Around October 10, 2011, the Master of the National Grange, Edward Luttrell, ordered an investigation of McFarland based on allegations that McFarland had engaged in various instances of misconduct. An investigation was subsequently undertaken by the California State Grange's Executive Committee at Luttrell's request.

Meanwhile, at the California State Grange's annual membership convention on October 14, 2011, McFarland was reelected to the position of Master/President. The following month, at the annual convention of the National Grange, a second vote was taken on the proposed amendment to section 4.5.7 of the National Grange's by-laws. Again, the California delegation voted against the amendment. Nevertheless, the amendment passed, and the expanded suspension/revocation provision became part of the National Grange's 2012 Digest of Laws.

In January 2012, the California State Grange's Executive Committee reported to Luttrell that it had found no violation of Grange law by McFarland and that its investigation was complete. Two of the elected members of the committee and the Overseer (Martha Stefenoni), however, sent Luttrell their own "minority report," disagreeing with the conclusion that the investigation was complete.

6

Between June 1 and August 1, 2012, McFarland served a 60-day suspension from his position with the California State Grange based on an incident involving the consolidation of two subordinate granges. On August 1, just as McFarland's two-month suspension ended, Luttrell suspended McFarland again based on various charges. While McFarland was suspended, the Overseer (Stefenoni) was supposed to act in his place as head of the State Grange, but McFarland and a majority of the Executive Committee refused to acknowledge the new suspension and refused to acknowledge Stefenoni's authority to act in McFarland's place. As a result, on September 17, 2012, Luttrell suspended the charter of the California State Grange based on his determination that the State Grange was "working in violation of the law and usages of the Order."

At a meeting of the Executive Committee of the suspended California State Grange a week later, from which the three members of the committee who had submitted the minority report on McFarland were absent, the other four members of the committee (McFarland, Jon Luvaas, Gerald Chernoff, and Damian Parr) voted not to honor Luttrell's suspension of McFarland or his suspension of the California State Grange. The voting committee members took the position that because the State Grange was a California corporation governed by California state law, Luttrell did not have the power to suspend either McFarland or the State Grange. The California State Grange did not appeal the suspension of its charter within the organization as allowed by the by-laws of the National Grange.

*This Filing Of This Action And Its Aftermath*

On October 1, 2012, the National Grange commenced the present action by filing a complaint for declaratory and injunctive relief against the suspended California State Grange and the four members of the Executive Committee who voted not to honor the suspensions of the State Grange and McFarland. On November 15, 2012, the California State Grange filed a cross-complaint against the National Grange and Luttrell.

7

In February 2013, McFarland was notified of the identities of three persons Luttrell had appointed to constitute the trial court that would hear the trial of the charges against him. Believing he would not receive a fair trial, in March 2013 McFarland obtained a preliminary injunction to halt the Grange trial proceedings. A week later, Luttrell revoked the California State Grange's charter "on the grounds that the California State Grange is continuing to work in violation of the law and usages of the Order and shows no desire to abide by the rules of the Order of Patrons of Husbandry." The California State Grange did not appeal the revocation of its charter within the organization as allowed by the by-laws of the National Grange.

In July 2013, the court granted the National Grange leave to file an amended complaint, which the National Grange then did. In its amended complaint for declaratory and injunctive relief, the National Grange alleged that with the revocation of the California State Grange's charter, the State Grange's property became the property of the National Grange to hold in trust until the California State Grange was reorganized under Grange law. The National Grange sought declaratory relief as to "whether the National Grange has the rightful authority to revoke the Charter of the California State Grange and compel it to turn over Grange property under Section 4.12.2 of the National Grange Bylaws." The National Grange also sought related injunctive relief. Finally, the National Grange added three new individual defendants -- Takashi Yogi, Kathy Bergeron, and Bill Thomas -- new members of the California State Grange's Executive Committee who were elected after the suspension of the State Grange's charter.[4]

---

[4] Because McFarland was separately represented in the trial court (and until after the opening briefs were filed on appeal), we will use the term the Guild defendants to refer jointly to all of the defendants in the action *except for* McFarland, and, as warranted, we will use the term defendants to refer jointly to all of the defendants in the action *including* McFarland.

8

At their annual meeting in October 2013, the members of the California State Grange approved a new set of by-laws that reflected that the State Grange was no longer affiliated with any national organization. In November 2013, the Executive Committee of the California State Grange sent a "Position Statement" to the National Grange noting "the revocation of our fraternal relationship" the previous year and announcing that, "[t]o preserve our corporate structure and protect and serve our members, by unanimous vote of the delegates at our 141st annual meeting, the California State Grange amended our By-Laws to acknowledge that we are no longer affiliated with the National Grange."

In February 2014, a number of Subordinate Granges in California organized a new corporation -- The Grange of the State of California's Order of Patrons of Husbandry, Chartered -- to become the new chartered State Grange within the Order. In July 2014, the National Grange granted a charter to this new organization.[5]

In January 2015, the National Grange filed a motion for leave to file a second amended complaint that eliminated the request for injunctive relief and sought only declaratory relief. The hearing on that motion was set for February 19. A copy of the proposed second amended complaint was attached to the motion. The proposed second amended complaint set forth three causes of action for declaratory relief, seeking declarations to the effect that the old California State Grange had no right to continue to possess or control Grange property in California and that all real and personal Grange

---

[5] We will refer to this entity as the new California State Grange, although in the trial court this entity was referred to as the Chartered California State Grange. Reference to the predecessor entity will be to the old California State Grange, the Unchartered California State Grange, or the Guild.

The new California State Grange and its Master, Ed Komski, were permitted to intervene as plaintiffs in the action in October 2014. Although they were not parties to the summary judgment motion at issue here, we have recognized them as respondents in this appeal.

9

property possessed or controlled by the old California State Grange should be transferred to the new California State Grange.

On February 13, 2015 -- a week before the hearing on the National Grange's motion for leave to file its second amended complaint -- the National Grange filed a motion for summary judgment on what was then still the *proposed* second amended complaint.[6] The hearing on the National Grange's motion for summary judgment was set for April 30, 2015, and notice of the motion was personally and electronically served on defendants on February 13, 2015 -- 76 days before the hearing.

On February 19, 2015, the trial court granted the National Grange leave to file its second amended complaint. On February 26, a signed copy of that complaint was served electronically and by mail on defendants.

On April 2, 2015, the Guild defendants demurred to the third cause of action in the second amended complaint on the grounds that the National Grange was not the real party in interest, the relief sought was contrary to California law, and the National Grange had failed to join necessary and indispensable parties.[7] The hearing on the demurrer was set for April 30, 2015-- the same day as the hearing on the National Grange's motion for summary judgment.

---

[6] In the alternative, the National Grange also sought summary adjudication on each of the three causes of action in the proposed second amended complaint, but the trial court ultimately treated the motion as one for summary judgment only because the National Grange's separate statement of material facts did not comply with provisions in the California Rules of Court relating to motions for summary adjudication.

[7] The third cause of action sought a declaration that "the right, title, and interest in all the real property and personal property formerly possessed and controlled by the Unchartered California State Grange *and/or by any subordinate Granges under its control*, which was to have been temporarily held in trust by the National Grange, now properly reverts to the Chartered California State Grange." (Italics added.)

10

On April 16, 2015, defendants filed their oppositions to the National Grange's motion for summary judgment.

On April 29, 2015, the trial court issued its tentative ruling sustaining the Guild defendants' demurrer with leave to amend on the ground that the National Grange had failed to add as necessary and indispensable parties the Subordinate Granges whose property interests were implicated by the third cause of action. The trial court also issued the following tentative ruling on the National Grange's motion for summary judgment: "Appearance required. Counsel shall be prepared to address whether in light of the amended pleading they wish to refile, or continue and supplement the motion for summary judgment . . . ."

The following day, at the hearing on the summary judgment motion and the demurrer, the court sought input from the parties on how to address the summary judgment motion in light of the assumption that the National Grange would be filing a further amended complaint based on the court's sustaining of the Guild defendants' demurrer to the second amended complaint with leave to amend. One of the Guild defendants' attorneys suggested that they should wait and see what the newly amended complaint alleged "and from that make a determination as to whether supplemental briefing is necessary on these motions," noting that "[t]he parties have gone to put a lot of effort into these papers." The court responded (in part), "Counsel, the motions are several feet high, so I'm willing to do anything that makes it easier for the Court and counsel, but at the same time, you know, it's becoming burdensome just in terms of the sheer volume of paper, but I'm not going to ask you to refile the same things all over again. I think that would be a mess. [¶] I would ask if you wish to do supplementary briefing, feel free to do it, but let's come up with a protocol so that it does not overwhelm the Court. We don't need repeat filings. You can refer to what you said in the papers that you filed here."

11

The National Grange's attorney then stated that he anticipated filing in very short order an amended complaint that changed "at most two paragraphs" to address the issue raised in the court's tentative ruling. Ultimately, the court suggested that the parties "meet and confer to come up with some dates" for a continued hearing and invited them to file an ex parte application to address the matter if they "r[an] into a roadblock."

Following the hearing, the court affirmed its tentative ruling on the demurrer and instructed the parties to meet and confer to schedule dates for the motion for summary judgment. In the event the parties could not agree on dates, the court noted that counsel could request an ex parte hearing.

On May 1, 2015 -- the day after the hearing -- the National Grange filed its third amended complaint. In the third cause of action in the third amended complaint, the National Grange omitted any reference to property possessed and/or controlled by the Subordinate Granges.

Ultimately the parties were unable to agree on a date for the continued hearing on the National Grange's summary judgment motion, so on May 15, 2015, the National Grange's attorney filed an ex parte application asking the court to set the date. The court set the continued hearing for June 10. Later, however, on its own motion, the court continued the hearing to July 1, then again to August 7. The only supplemental papers filed on the summary judgment motion were a request for judicial notice filed by the National Grange and oppositions to that request filed by McFarland and the Guild defendants.

The National Grange's motion for summary judgment was finally heard on August 7, at which time the court took the matter under submission. On August 18, the court issued its order granting summary judgment. Although the court noted the "chaotic" procedural history of the case relating to the overlap between the filing of the amended complaints and the summary judgment motion, the court nonetheless declined to deny the motion on the basis of that procedural history because defendants did "not

12

contend that they ha[d] been prejudiced as a result of [the] National Grange's actions." Furthermore, with respect to the fact that the third amended complaint was now the operative pleading but the motion sought summary judgment on the second amended complaint, the court found "the amendments to the third cause of action to the [third amended complaint] d[id] not substantively affect the nature of th[e] motion as they essentially removed the few references to the subordinate Granges," and thus the court treated the motion as if made to the third amended complaint.

Finding no triable issue of fact on any of the National Grange's three causes of action, the trial court essentially determined that the National Grange was entitled to a judgment of declaratory relief declaring as follows:

(1) "because the Now Unchartered State Grange's Charter was revoked under the Bylaws of the Order, and Defendants have acknowledged this disaffiliation from the Order, they have no standing to retain the real and personal property belonging to the Grange";

(2) "by following [the National Grange's] rechartering rules under the Bylaws of the Order, the Newly Chartered State Grange is properly recognized as the sole chartered Grange entity entitled to use and control Grange property in California";

(3) "the property should revert to possession and/or control of the Newly Chartered State Grange under the Bylaws."

In clarifying exactly what property was subject to these declarations, the trial court explained that "the Now Unchart[er]ed State Grange has the obligation to transfer to the Newly Chartered State Grange all Grange property in its possession or control as of the date its Charter was revoked."

The court entered the formal order granting summary judgment on September 8. On October 2, the Guild defendants and McFarland separately filed their notices of appeal from that order. On November 16, 2015, the court entered judgment in favor the

13

National Grange.  On November 18, the Guild defendants filed a notice of appeal from the judgment.**8**

DISCUSSION

I

*Statutory Notice And The Operative Complaint*

Defendants contend the judgment should be reversed because the hearing on the National Grange's summary judgment motion was set only 63 days after the second amended complaint -- the pleading on which the National Grange sought summary judgment -- was served by mail.  In a related contention, defendants assert that the judgment should be reversed because the trial court entered judgment on a complaint that was materially different from the complaint that was operative when the summary judgment motion was filed.  We disagree on both points.

Subdivision (a)(2) of section 437c of the Code of Civil Procedure**9** provides, with respect to a summary judgment motion, that "[n]otice of the motion and supporting

---

**8**    McFarland did not file a notice of appeal from the judgment, but we exercise our discretion to treat his notice of appeal from the order granting summary judgment as a notice of appeal from the subsequent judgment.  (See California Rules of Court, rule 8.104(d)(2).)

In June 2016, before briefing, defendants Luvaas, Chernoff, and Parr filed an abandonment of their appeal in the trial court.  Accordingly, the remaining appellants/defendants are the Guild, McFarland, Yogi, Bergeron, and Thomas.

This matter was fully briefed in January 2017, but the resolution of the appeals was delayed significantly following a postbriefing motion to disqualify defendants' counsel filed by the National Grange in March 2017.  Specifically, this court granted the disqualification motion in May 2017 and ordered defendants to "promptly notify this court upon the selection and hiring of replacement counsel;" however, they did not do so.  In August 2017, this court issued an order to show cause based on defendants' failure to timely notify this court of the selection and hiring of replacement counsel, and this court set a hearing on the matter for September 18.  It was only *after* the hearing that defendants finally substituted replacement counsel into these appeals.

14

papers shall be served on all other parties to the action at least 75 days before the time appointed for hearing.  If the notice is served by mail, the required 75-day period of notice shall be increased by 5 days if the place of address is within the State of California . . . ."  Here, the hearing on the National Grange's motion for summary judgment on the second amended complaint was set for April 30, 2015, and notice of that motion was personally and electronically served on defendants on February 13, 2015 -- 76 days before the hearing.  At the time of service, however, the second amended complaint was not yet operative.  It was not until February 19 that the court granted the National Grange leave to file its second amended complaint, and it was not until February 26 that a signed copy of that complaint was served electronically and by mail on defendants.

Based on the date of service of the second amended complaint, defendants claim they were denied the statutory notice period to which they were entitled.  In particular, because section 437c requires service of the "[n]otice of the motion and *supporting papers* . . . at least 75 days before the time appointed for hearing" (§ 437c, subd. (a)(2), italics added), defendants contend the second amended complaint, on which the National Grange sought summary judgment, was a "supporting paper" that had to be served at least 75 days before the hearing.

For their part, the Guild defendants provide no authority for the proposition that the complaint on which summary judgment is sought is necessarily a "supporting paper" under subdivision (a)(2) of section 437c that must be served at least 75 days before the hearing.  For his part, McFarland takes the position that the complaint *must* be a "supporting paper" because the pleadings frame the issues that may be addressed on summary judgment.  (See, e.g., *Lyons v. Security Pacific Nat. Bank* (1995) 40

---

**9** All further section references are to the Code of Civil Procedure unless otherwise noted.

15

Cal.App.4th 1001, 1018 ["In a motion for summary judgment, the issues are framed by the pleadings"].)  In response, the National Grange points out that the summary judgment statute itself provides that a motion for summary judgment "shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken," as well as by "a separate statement setting forth plainly and concisely all material facts that the moving party contends are undisputed."  (§ 437c, subd. (b)(1).)  The National Grange contends that because the complaint is not mentioned in subdivision (b)(1) of section 437c, "and normally is not filed or served with a motion for summary judgment," it is not a "supporting paper" that must be served at least 75 days before the hearing on the motion.

Taking a slightly different tack, defendants also contend the summary judgment should be reversed based on the fact that the complaint on which the National Grange sought summary judgment -- the proposed second amended complaint -- was materially different from the complaint that was operative when the summary judgment was filed -- the first amended complaint.

We need not decide whether the complaint is a "supporting paper" that must be served at least 75 days before the hearing on a summary judgment motion, or whether the complaint on which the National Grange sought summary judgment was materially different from the complaint that was operative when the summary judgment was filed, because defendants have failed to make an affirmative showing of prejudice with regard to either argument.  (See *Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601 ["The burden is on the appellant in every case affirmatively to show error and to show further that the error is prejudicial . . . .  To presume in favor of error or prejudice would be directly contrary

16

to the policy of this state as declared in section 4 1/2 of Article VI of the Constitution and to the admonitions of section 475 of the Code of Civil Procedure"].)[10]

Central to the issue of prejudice, or lack thereof, is the fact that three weeks before the summary judgment motion was served, the National Grange had served its motion for leave to file the second amended complaint, and the hearing on that motion was set for February 19, less than a week after the summary judgment motion was served. Thus, while the second amended complaint may not have been operative when the summary judgment was filed, defendants cannot complain that they were unaware of its contents at that time, as a draft of that complaint was attached to the motion for leave to file it.

The fact that the contents of the proposed second amended complaint were known to defendants weeks before the summary judgment motion was filed and served tends to support the conclusion that they suffered no prejudice from the fact that the National Grange was allowed to seek summary judgment on a complaint that was not yet operative at the time the summary judgment motion was filed and served and that was not served as one of the "supporting papers" for that motion. And this conclusion of no prejudice is supported by other facts as well. Although the Guild defendants and McFarland objected in their opposing papers in the trial court to the fact that the second amended complaint was not yet operative when the National Grange filed and served its summary judgment motion, none of the defendants claimed, let alone proved, any *prejudice* resulting from

---

[10]     "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (§ 475.)

17

that fact. Indeed, the trial court noted as much when it declined to deny the motion on the basis of the "chaotic" procedural history of the case because defendants did "not contend that they ha[d] been prejudiced as a result of [the] National Grange's actions."

It is also worth noting that all defendants opposed the summary judgment motion with voluminous papers: the Guild defendants' opposition papers numbered approximately 514 pages while McFarland's numbered approximately 400. And in voluminously opposing the motion, defendants did not argue that they could have put on an even bigger or better showing in opposition if the second amended complaint had actually been *operative*, instead of just *proposed*, at the time the summary judgment motion was filed and served. Moreover, defendants did not ask the trial court to continue the hearing on the summary judgment motion to cure the supposedly defective/inadequate notice issue so that they could file new and better opposing papers.

In *Carlton v. Quint* (2000) 77 Cal.App.4th 690, 697-698, the appellate court suggested that when "an attorney who claims his client was not properly served with motion papers and/or that inadequate notice of the hearing was received" "is unwilling to take the chance that a continuance will be granted, he or she should file the best opposition possible under the circumstances. The opposition should include counsel's position on the defective-service/inadequate-notice issue, as well as the merits. The opposition should contain a complete discussion of counsel's position as to why a more complete opposition was not able to be filed (e.g., because the defective notice of motion did not give counsel adequate time to prepare a response). Counsel should then appear at the hearing, object to the hearing taking place because the service was defective and/or inadequate notice of the hearing was received; again explain to the court the prejudice that has been suffered by reason of the defective service and/or inadequate notice; and request a continuance of the hearing so that a proper response to the motion may be filed." Defendants did none of these things.

18

It should also be noted that the summary judgment motion was not actually heard on its merits until August 7, 2015 -- more than three months after it was originally set to be heard. While defendants filed their opposing papers in time for the original hearing date, they never sought permission to improve their showing in opposition to the motion in the intervening months, even with the filing of the third amended complaint on May 1, 2015. Instead, at the initial hearing on the motion, one of the Guild defendants' attorneys suggested only that they should wait and see what the National Grange's third amended complaint alleged "and from that make a determination as to whether supplemental briefing is necessary on these motions." The court made it clear that supplemental papers would be fine, but defendants never filed any supplemental papers in the more than three months that elapsed between the filing of the third amended complaint and the hearing on the summary judgment motion.

Under these circumstances, defendants have failed to make an affirmative showing of any prejudicial error. They vigorously and voluminously opposed the National Grange's summary judgment motion based on the second amended complaint, which, while not operative until two weeks after the summary judgment motion was filed, was served upon them in its proposed form three weeks *before* the motion was filed. Moreover, to the extent they assert that the complaint on which the trial court ultimately granted summary judgment -- the third amended complaint -- was "materially different" from the complaint they addressed in opposing the summary judgment motion -- the second amended complaint -- defendants fail to identify any such material difference. Indeed, in granting summary judgment, the trial court specifically found that the amendments made in the third amended complaint "d[id] not substantively affect the nature of th[e summary judgment] motion" because all the amendments did was remove a few references to property of the Subordinate Granges.

So, to summarize: Under the circumstances of this case, defendants have not shown any prejudice from the fact that the trial court allowed the National Grange to seek

summary judgment on an amended complaint that was not yet operative when the summary judgment motion was filed or from the fact that the version of the complaint on which the National Grange sought summary judgment was not served with the moving papers. On this record, the only reasonable conclusion is that defendants had a full and fair opportunity to dispute the material allegations leveled by the National Grange in its complaint for declaratory relief. Thus, no prejudicial error has been shown.

II

*Necessary And Indispensable Parties*

Defendants next contend the judgment should be reversed because Subordinate Granges who were members of the California State Grange and whose assets are controlled by the State Grange were not joined in the action. This argument lacks merit for two reasons.

First, it is true that in opposing the summary judgment motion the Guild defendants argued that the trial court lacked jurisdiction to adjudicate the property rights of the Subordinate Granges because those parties were indispensable parties that had not been joined in the action. What defendants fail to note, however, is that this argument was directed at the allegations in the third cause of action of the second amended complaint relating to the property of the Subordinate Granges that were later *removed* when the National Grange filed its third amended complaint. With the filing of the third amended complaint, this entire issue became moot.

Second, in arguing that notwithstanding the amendments made in the third amended complaint the trial court's judgment necessarily adjudicated the rights of the Subordinate Granges, defendants rely entirely on evidence that *postdates* the summary judgment motion. They specifically argue that "it became clear *following the granting of the [summary judgment m]otion*, and prior to entry of Judgment, that [the] National Grange indeed sought and obtained relief affecting the rights of non-party entities." (Italics added.) The evidence upon which they rely, which purportedly shows that the

20

Guild "holds funds for its corporate members in [an] Asset Management Account," was presented to the trial court in connection with a motion for a preliminary injunction the National Grange filed *after* the trial court granted summary judgment, in which the National Grange sought "a narrow preliminary injunction designed simply to preclude Defendants from wasting Grange assets until the case is finally adjudicated."[11] Defendants offer no authority, however, that they are entitled to show error in the granting of summary judgment based on evidence that was not presented to the court until *after* summary judgment was granted. In the absence of such authority, we need not consider this argument further.

III

*Who Owns The Grange Property?*

That brings us to the heart of the summary judgment motion. For his part, McFarland next contends the National Grange did not meet its burden of showing that it was entitled to summary judgment and, in any event, there are triable issues as to who owns, possesses, or controls "Grange Property." For their part, the Guild defendants contend triable issues exist as to whether the California State Grange headquarters belongs to the Guild, whether the National Grange's by-laws are effective under California law to require the Guild to transfer the headquarters property to the new State Grange, whether there was any lawful agreement requiring the Guild to transfer the headquarters property upon revocation of its charter, and whether the Guild is obligated to transfer to the new California State Grange all real and personal property the old California State Grange held as of the date its charter was revoked.

---

[11]    The evidence was specifically a statement by McFarland in a declaration, otherwise unsubstantiated, that the account in question contained, among other sums, "financial assets belonging to the 'Subordinate Granges.'"

21

Unfortunately, defendants' scattershot approach to attacking the summary judgment in favor of the National Grange is not particularly helpful or elucidating. As we see it, the dispositive issue here is whether, under the undisputed facts presented to the trial court, that court erred in summarily declaring -- in essence -- that upon revocation of the old California State Grange's charter, all right, title, and interest to the real and personal property then owned by the old California State Grange passed to the National Grange pursuant to the by-laws of the National Grange, to be held in trust until the new California State Grange was chartered. As we will explain, we find no such error.

A

*The Neutral-Principles Approach To Resolving*

*Property Disputes Within Fraternal And Religious Organizations*

Historically, California courts have, on occasion, been called on to resolve internal property disputes involving various types of fraternal and religious organizations. (See, e.g., *Most Worshipful Lodge v. Sons etc. Lodge* (1953) 118 Cal.App.2d 78; *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599.) Most recently, in *Episcopal Church Cases* (2009) 45 Cal.4th 467, the California Supreme Court held that "to the extent the court can resolve [a church] property dispute without reference to church doctrine, it should use what the United States Supreme Court has called the 'neutral principles of law' approach." (*Id.* at p. 473.) Under this approach, "[t]he court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes." (*Ibid.*) This approach involves the application of " 'neutral principles of law, developed for use in all property disputes.' " (*Id.* at p. 480, quoting *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 665].)

In *Episcopal Church Cases*, "a local church ha[d] disaffiliated itself from a larger, general church with which it had been affiliated," and "[b]oth the local church and the

22

general church claim[ed] ownership of the local church building and the property on which the building st[ood]." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 472.) In the context of an anti-SLAPP motion in which the trial court had ruled in favor of the local church and the Court of Appeal had ruled in favor of the general church, the Supreme Court granted review to (among other things) "address the merits of the church property dispute" and, like the Court of Appeal, the Supreme Court decided in favor of the general church, concluding that when the local church disaffiliated from the general church, "the local church property reverted to the general church." (*Id.* at pp. 474-476, 493.) A close examination of how the Supreme Court applied the relevant neutral principles of law to decide the property dispute in favor of the general church will prove helpful in applying those same principles here.

The relevant facts were these: The general church at issue was the Protestant Episcopal Church in the United States of America (the Episcopal Church). The Episcopal Church is divided geographically into dioceses, including the Episcopal Diocese of Los Angeles (the Los Angeles Diocese). The local church was St. James Parish in Newport Beach (St. James Parish), an individual church within the Los Angeles Diocese. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 474.)

When St. James Parish sought permission from the Los Angeles Diocese to organize as a parish in 1947, the members promised in their application that the parish would " 'be forever held under, and conform to and be bound by . . . the Constitution and Canons of the [Episcopal Church] . . . .' " (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 474.) The articles of incorporation St. James Parish filed with the California Secretary of State in 1949 further provided " 'that the Constitution and Canons, Rules, Regulations and Discipline of [the Episcopal] Church . . . for the time being shall, unless they be contrary to the laws of this State, always form a part of the By-Laws and Articles of Incorporation of the corporation hereby formed and shall prevail against and govern

23

anything herein contained that may appear repugnant to such Constitutions, Canons, Rules, Regulations and Discipline.' " (*Ibid.*)

In 1950, St. James Parish acquired the property on which the church building stood at the time of the later dispute, and the deeds to the property were always in the name of the local church. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 474.)

Dating back to the 1800's, Canon II.6 of the canons of the general convention of the Episcopal Church "impose[d] substantial limitations on the local parish's use of church property and g[a]ve the higher church authorities substantial authority over that property." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 474-475, 487.) In 1979, the Episcopal Church added section 4 to its Canon I.7, providing that " '[a]ll real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church, and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 475.)

In 2004, the board of St. James Parish voted to end its affiliation with the Episcopal Church because of a doctrinal dispute. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 475.) The decision was supported by a majority of the congregation. (*Id.* at p. 476.) After the disaffiliation, a dispute arose over which entity owned the church building and the property on which the building stood -- the local church or the general church. (*Ibid.*) That dispute led to the litigation that ended up in front of the California Supreme Court.

In applying the neutral principles of law the court had determined should be used to resolve such property disputes, the Supreme Court began by noting that record title to the property was held by St. James Parish. (*Episcopal Church Cases*, *supra*, 45 Cal.4th

24

at p. 485.) The court then noted that, "[o]n the other hand, from the beginning of its existence, St. James Parish promised [in its original application and in its articles of incorporation] to be bound by the constitution and canons of the Episcopal Church," which beginning in 1979 "provide[d] that property held by a local parish is 'held in trust' for the general church and the diocese in which the local church is located" and which even before 1979 "contained substantial restrictions on the local use of church property." (*Id.* at pp. 485-486.)

The California Supreme Court went on to explain how the 1979 amendment to the general church's canons was consistent with the United States Supreme Court's explanation of the neutral-principles approach in *Jones v. Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775], where the United States Supreme Court wrote as follows: " 'Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.' " (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 487, quoting *Jones v. Wolf*, *supra*, 443 U.S. at p. 606 [61 L.Ed.2d at p. 786], italics omitted.)

The California Supreme Court then observed that "the high court's discussion in *Jones v. Wolf . . .* , together with the Episcopal Church's adoption of Canon I.7.4 in response, strongly supports the conclusion that, once [St. James Parish] left the general church, the property reverted to the general church." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 487.) The court further observed that the amendment to Canon I.7 was consistent with the earlier canons, giving rise to "a strong argument that Canon I.7.4

25

merely codified what had long been implicit." (*Episcopal Church Cases*, at pp. 487-488.)

Moving on from the church documents, the court pointed out that Corporations Code section 9142 "also support[ed] the conclusion that the property now belongs to the general church." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 488.) That statute, which applies specifically to nonprofit religious corporations (see Corp. Code, § 9110 et seq. [the Nonprofit Religious Corporation Law]), provides that "[n]o assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies: [¶] (1) Unless, and only to the extent that, the assets were received by the corporation with an express commitment by resolution of its board of directors to so hold those assets in trust. [¶] (2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide." (Corp. Code, § 9142, subd. (c).) The court explained that "[s]ubdivision (c) of . . . section [9142] permits the governing instruments of the general church to create an express trust in church property, which Canon I.7.4 does. . . . So it would appear that this statute also compels the conclusion that the general church owns the property now that [St. James Parish has] left the general church." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 488-489.)

In answer to the reliance of St. James Parish on Evidence Code section 662, which provides that "[t]he owner of the legal title to property is presumed to be the owner of the full beneficial title" and "[t]his presumption may be rebutted only by clear and convincing proof," the California Supreme Court agreed with the Court of Appeal, which had noted that, " 'particularly when read in conjunction with section 9142, canon I.7.4 *is* clear and convincing evidence rebutting any presumption that the beneficial interest in the local church property is solely controlled by the local parish corporation." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 492.)

26

B

*Application Of The Neutral-Principles Approach To This Case*

With the foregoing understanding of how our Supreme Court applied the neutral-principles approach to the facts in *Episcopal Church Cases*, we turn to the application of that approach to the facts of this case as presented on summary judgment. First, however, we address -- and reject -- defendants' arguments in their reply brief[12] that *Episcopal Church Cases* "has no relevance here." (Bold text and capitalization omitted.) According to defendants, *Episcopal Church Cases* "turned on Corporations Code [section] 9142," which is not applicable here because it applies only to religious corporations. But the foregoing discussion of the case shows that the case did *not* turn on that statute; the statute was only one factor in the court's multi-faceted analysis. Moreover, to say, as defendants do, that Corporations Code section 9142 "expressly authorizes a national church to unilaterally impose a trust on property held by a local church" is to misapprehend the effect of that statute. Corporations Code section 9142 does not *grant* national churches the authority to impose a trust on local church property that otherwise they would not have. That is, the statute is not the source of a national church's power to impose a trust. Rather, what the statute does is place certain conditions on the imposition of such a trust. In other words, the statute precludes the assets of a local church from being "deemed to be impressed with any trust, express or implied, statutory or at common law," unless certain requirements are met. (Corp. Code, § 9142, subd. (c).) Thus, it does not follow from Corporations Code section 9142 that there must be a similar statute that applies to mutual benefit corporations for the National Grange to prevail here.

---

[12] Although the Guild defendants and McFarland filed separate opening briefs, they filed a single reply brief.

27

To the extent defendants contend *Episcopal Church Cases* does not apply here because "religious property disputes are *sui generis*," they are again mistaken. The very point of the neutral-principles approach developed by the United States Supreme Court in *Jones v. Wolf* and applied by the California Supreme Court in *Episcopal Church Cases* is to decide intra-church property disputes by reference to " 'neutral principles of law, developed for use in *all* property disputes.' " (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 480, italics added.) Thus, there is nothing about the neutral-principles of law approach that is limited to *religious* property disputes.

To the extent defendants contend, referencing a passage from Justice Kennard's concurring and dissenting opinion in *Episcopal Church Cases*, that a trust cannot be unilaterally created by the declaration of the nonowner of the property that the owner of the property is holding it in trust for the nonowner (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 495), the discussion that follows below will show that no such unilateral declaration occurred here. As will be shown, while the result here is dictated in part by the provisions of the National Grange's by-laws, the old California State Grange, from its very creation by the charter the National Grange granted, agreed to be bound by the National Grange's by-laws, so there was nothing "unilateral" about the result that flowed from the old California State Grange's voluntary submission to those rules.

Finally, to the extent defendants argue that the neutral-principles approach of *Episcopal Church Cases* should not be applied here, but instead a "similar" "multifaceted inquiry in property disputes between voluntary fraternal organizations" applied in *Bressler v. American Federation of Human Rights* (10th Cir. 2002) 44. Fed. Appx. 303 should be applied in its place, we have this observation: while federal circuit court opinions may serve as persuasive authority, they are not binding on California courts. (*Godfrey v. Oakland Port Services Corp.* (2014) 230 Cal.App.4th 1267, 1277, fn. 10.) A decision of the California Supreme Court, on the other hand, *does* bind us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Although *Episcopal Church*

28

*Cases* involved a dispute over church property, the neutral-principles approach applied there is, as we have explained, by its very nature *neutral*:  that is, it is an approach developed for use in *all* property disputes.  Accordingly, we are bound by California Supreme Court precedent to apply that approach here, and so we turn to the application of that approach to the facts developed on summary judgment in this case.

As in *Episcopal Church Cases*, we first note that, at least with respect to the real property where the State Grange headquarters are located, record title is held in the name of the old California State Grange.  Of course, that is not dispositive.  Under Evidence Code section 662, record title creates only a presumption that beneficial title to the property rests with the old California State Grange.  Accordingly, we turn to the next element considered under the neutral-principles approach:  the local entity's articles of incorporation.

As we have noted, the old California State Grange received its charter from the National Grange in 1873 and participated as a subordinate and constituent part of the Order from that time through 2012, operating as an unincorporated association until 1946, when the old California State Grange reorganized as a nonprofit mutual benefit corporation under California law.  The articles of incorporation identified a number of purposes for the formation of the corporation, the first of which was "[t]o incorporate and take over the existing unincorporated association known as 'California State Grange.' " The articles further provided that all members of the voluntary association that was the old California State Grange were to be members of the corporation and that the constitution and by-laws of the unincorporated association would be and remain the constitution and by-laws of the corporation until amended.

That, of course, leads us to consider the constitution and by-laws of the old California State Grange.  As we have noted, the version of the old California State Grange's constitution from 2011 provided that "[t]he State Grange, as a chartered division of the National Grange, shall have the right and power, as the good of the Order

requires, to adopt laws for the organization, administration and regulation of the affairs of the various divisions of the State Grange, including laws limiting, defining, and regulating the powers of the various Granges of the divisions of the State Grange, *so long as they do not conflict with the laws of the National Grange*." (Italics added.) The old California State Grange's constitution also provided that "[a]ll candidates for membership and elected officers shall be required to agree at the time of election to membership, or installation in office, that *at all times they will faithfully comply with the Constitution, By-Laws, and Codes of the Grange* at all levels, as from time to time adopted." (Italics added.) Similarly, the old California State Grange's by-laws provided that "[i]t shall be the duty of the officers of the various Granges of the Order to ensure that the Constitution and By-Laws of the Grange at all levels are observed and obeyed . . . ."

This leads us to the next element considered under the neutral-principles approach: the National Grange's constitution and by-laws. As we have noted, under the Order's constitution the National Grange has "the right and power as the good of the Order requires, to adopt laws for the organization, administration and regulation of the affairs of the various Granges of the divisions of the Order including laws limiting, defining, and regulating the powers of the various Granges of the divisions of the Order." Under the constitution, the National Grange also has the power to "issue all Charters for the various Granges of the divisions of the Order," and "[a]ll Charters issued to the various Granges of the divisions of the Order shall provide that members of each Grange at all times will faithfully comply with the Constitution of the Order, the Articles of Incorporation, By-Laws and Grange Laws and Usage of the various Granges of the divisions of the Order as from time to time adopted."

As for the by-laws of the National Grange, those by-laws provide that "[t]he Constitution of the Order . . . is the supreme law of the Order and shall be determinative of the rights and duties of the various Granges of the divisions of the Order and members

30

thereof as provided in these By-Laws." In addition, as particularly relevant here, section 4.5.7 of the by-laws gives the Master of the National Grange the power to suspend or revoke the charter of a State Grange in various circumstances, including when "the State Grange is working in violation of the law and usages of the Order." Under section 4.5.9 of the by-laws, "[a]s soon as possible after the final determination of revocation of a [State Grange's] Charter," "[a]ll remaining assets owned by such State Grange shall be placed in trust as provided for in Article XII of these By-Laws." Under article XII, "[w]henever a State Grange surrenders its Charter or otherwise becomes Inactive, the net assets of that Grange shall be retained by the Order for use in accordance with the general purposes of the Order, subject to the following terms and conditions: [¶] (A) All right, title and interest as to all real and personal property owned by a State Grange which surrenders its Charter or otherwise becomes Inactive shall become the Property of the National Grange. The National Grange shall hold such property in trust for the benefit of the Inactive State Grange until said State Grange is reorganized pursuant to Grange Law."

As for the final element of the neutral-principles approach noted in *Episcopal Church Cases* -- relevant statutes -- we consider two provisions of the Nonprofit Mutual Benefit Corporation Law (Corp. Code, § 7110 et seq.) the Guild defendants contend are relevant here. The first provision, Corporations Code section 7132, provides that "(a) [t]he articles of incorporation may set forth any or all of the following provisions, which shall not be effective unless expressly provided in the articles: [¶] . . . [¶] (4) In the case of a subordinate corporation instituted or created under the authority of a head organization, a provision setting forth either or both of the following: [¶] (A) That the subordinate corporation shall dissolve whenever its charter is surrendered to, taken away by, or revoked by the head organization granting it. [¶] (B) That in the event of its dissolution pursuant to an article provision allowed by subparagraph (A) or in the event of its dissolution for any reason, any assets of the corporation after compliance with the

31

applicable provisions of Chapters 15 (commencing with Section 8510), 16 (commencing with Section 8610), and 17 (commencing with Section 8710) shall be distributed to the head organization." The second provision, Corporations Code section 9913, subdivision (b), provides that Corporations Code section 7132 does not apply to a nonprofit mutual benefit corporation "unless and until an amendment of the articles of incorporation is filed stating that the corporation elects to be governed by all of the provisions of the new law not otherwise applicable to it under this part."

The Guild defendants contend these provisions of the Corporations Code "allow[] distribution of assets upon [charter] revocation for pre-1980 subordinate corporations (like [the] Guild) only if two conditions are met: (1) the subordinate corporation may not provide for distribution of its assets on revocation 'unless and until an amendment of the articles of incorporation is filed stating that the corporation elects to be governed by' the provisions of section 7132 of the current nonprofit mutual benefit corporation law; second, provision for such a distribution of assets must be 'expressly provided' in the articles of incorporation of the subordinate corporation," and "[t]here is no evidence in the record that the restrictions in these statutes were met."

The Guild defendants' interpretation of the foregoing statutes is erroneous. Essentially the Guild defendants contend that all of the provisions we have set forth above from the old California State Grange's articles of incorporation, constitution, and by-laws, and from the Order's constitution and the National Grange's by-laws, could not operate to require the property of the old California State Grange to pass to the National Grange upon revocation of the old California State Grange's charter because the old California State Grange's articles of incorporation were never amended to include the provisions in subdivision (a)(4) of section 7132 or to state that the corporation elected to be governed by all of the provisions of the new Nonprofit Mutual Benefit Corporation Law not otherwise applicable to it. The flaw in this argument is that Corporations Code section 7132 does not provide that the *only* way the property of a subordinate corporation

32

can pass to a head organization upon revocation of the subordinate corporation's charter is if the provisions set forth in Corporations Code section 7132 are included in the subordinate corporation's articles of incorporation. Instead, Corporations Code section 7132 provides for an *optional* provision that "may" be included in the articles of incorporation of a nonprofit mutual benefit corporation to provide for *the dissolution of the corporation upon revocation of its charter* and, if included, the distribution of the corporation's assets to the head organization *upon dissolution of the corporation*. But nothing in Corporations Code section 7132 precludes a head organization and a subordinate corporation from providing for the passage of property from the subordinate corporation to the head organization by means of *other* provisions -- particularly other provisions (like those at issue here) that *do not provide* for the dissolution of the subordinate corporation, but only for the disposition of the subordinate corporation's property.

That a head organization and a subordinate corporation may use provisions other than those set forth in Corporations Code section 7132, subdivision (a)(4) to require a transfer of the property of the subordinate corporation to the head organization upon revocation of the subordinate corporation's charter is further evidenced by subdivision (b) of Corporations Code section 7132, which provides that "[n]othing contained in subdivision (a) shall affect the enforceability, as between the parties thereto, of any lawful agreement not otherwise contrary to public policy." The Guild defendants argue that "there is no evidence that [the] Guild agreed to transfer the Headquarters upon revocation of its charter." For the moment, however, that is not the point. The point is that subdivision (b) of Corporations Code section 7132 confirms that subdivision (a) of that statute does not have preemptive effect -- that is, subdivision (a) does not preclude a head organization and a subordinate corporation from using other means to provide for the transfer of the subordinate corporation's property to the head organization upon revocation of the subordinate corporation's charter.

33

That subdivision (a) of Corporations Code section 7132 does not have preemptive effect is also confirmed by a comparison of the language of that provision with the language of Corporations Code section 9142 -- the statute the California Supreme Court analyzed in *Episcopal Church Cases*. As we have seen, Corporations Code section 9142, subdivision (c) provides that "[n]o assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies: [¶] (1) Unless, and only to the extent that, the assets were received by the corporation with an express commitment by resolution of its board of directors to so hold those assets in trust. [¶] (2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide." Thus, this statute clearly specifies that the assets of a religious corporation *cannot* be deemed to be impressed with any trust, express or implied, statutory or at common law, unless the specific requirements of the statute are met. In contrast, Corporations Code section 7132 does *not* provide that the assets of a mutual benefit corporation that is subordinate to a head organization cannot be required to pass to the head organization upon revocation of the corporation's charter unless the specific provisions in subdivision (a) of Corporations Code section 7132 are included in the corporation's articles of incorporation. Instead, as we have explained already, Corporations Code section 7132 merely identifies one way by which such a passage of property can be accomplished; nothing in the statute precludes a head organization and a subordinate corporation from providing for the passage of property from the subordinate corporation to the head organization by means of other provisions.

So where does that leave us? Concluding that the statutes the Guild defendants invoke do not have the effect the Guild defendants attribute to them, we are left with the conclusion that no California statute precludes us from construing together all of the various provisions set forth above from the old California State Grange's articles of

34

incorporation, constitution, and by-laws, and from the Order's constitution and the National Grange's by-laws, to determine whether they required the property of the old California State Grange to pass to the National Grange upon revocation of the old California State Grange's charter, notwithstanding the presumption arising from the fact that record title to the headquarters property is held in the name of the old California State Grange. And construing those provisions all together, we agree with the trial court that they *do* require that transfer. Essentially, all of those provisions, read as a whole, provide that: (1) the old California State Grange was subject to the by-laws of the National Grange, as amended from time to time; (2) the by-laws of the National Grange that took effect before the dispute arose between the National Grange and the old California State Grange gave the National Master the power to revoke the old California State Grange's charter; and (3) under those same by-laws, upon revocation of that charter, the property of the old California State Grange was to be retained by the Order and held in trust by the National Grange until the State Grange was reorganized pursuant to Grange law.

Moreover, just as the California Supreme Court concluded in *Episcopal Church Cases* that canon I.7.4 of the Episcopal Church was clear and convincing evidence that rebutted the presumption of Evidence Code section 662 that beneficial title was held by the owner of record (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 492), we conclude that all of the governing provisions here constitute clear and convincing proof sufficient to rebut the presumption arising from Evidence Code section 662 that the old California State Grange holds beneficial title to the headquarters property because it is the record owner of the property. On that point, we are not persuaded by the Guild defendants' reliance on *Callahan v. Chatsworth Park, Inc.* (1962) 204 Cal.App.2d 597, 608 for the proposition that " '[t]he question of whether evidence is clear and convincing . . . necessarily involves a weighing of the evidence, and that is not the function of the court upon a motion for summary judgment.' " The flaw in that argument lies in what the

35

Guild defendants omit from their quote from *Callahan* -- the phrase, "that there has been a violation of sections 1190.1, subdivision (e) and 1193.1, subdivision (k)." (*Ibid.*) As the National Grange points out, *Callahan* "examined whether a mechanics lien was forfeit under Code of Civil Procedure [sections] 1190.1 and 1193.1 because the defendant had 'willfully include[d] in his claim' work not performed. [Citation.] The question of willfulness required a finding of 'an intent to defraud [which] always presents a factual question,' and so summary judgment was inappropriate." In essence, then, *Callahan* stands for no more than the proposition that whether there was clear and convincing evidence of an intent to defraud in that case could not be decided on summary judgment. That does *not* mean that clear and convincing proof rebutting the presumption arising from Evidence Code section 662 could not be presented on summary judgment here. Indeed, the California Supreme Court's decision in *Episcopal Church Cases* supports the conclusion that such evidence *could* be presented here, because there, in the context of an anti-SLAPP motion -- which like a summary judgment motion is decided on affidavits and not testimony -- the court decided that canon I.7.4 of the Episcopal Church was clear and convincing evidence that rebutted the presumption of Evidence Code section 662. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 492.) Just so, we have concluded here that the various provisions contained in the old California State Grange's articles of incorporation, constitution, and by-laws, in the Order's constitution, and in the National Grange's by-laws, taken together, constitute clear and convincing proof that was sufficient to rebut the presumption regarding beneficial title arising from the fact that record title to the headquarters property is held in the name of the old California State Grange.

In summary, then, when the National Master exercised his power pursuant to the by-laws of the National Grange, to which the old California State Grange was subject, to revoke the old California State Grange's charter, pursuant to those same by-laws the property belonging to the old California State Grange was to be retained by the Order and

36

held in trust by the National Grange until the new California State Grange was chartered. Thus, applying the neutral-principles approach required by the California Supreme Court in *Episcopal Church Cases* to the facts shown on summary judgment here, we conclude that the trial court did not err in granting judgment in favor of the National Grange and making the declarations that it did as part of that judgment.

## C

### *Defendants' Remaining Arguments*

Having reached the foregoing conclusion, we turn now to the remainder of the scattershot arguments offered by defendants that we have not addressed already to see if any of those arguments undermine our conclusion. As we will explain, none of them does.

The Guild defendants first contend the "National Grange did not demonstrate by clear and convincing undisputed evidence that [the old California State Grange] recognized it was subject to the provisions of [the] National Grange's By-Laws." This is, in effect, just a different iteration of defendants' argument in their reply brief, based on the passage from Justice Kennard's concurring and dissenting opinion in *Episcopal Church Cases*, that a trust cannot be unilaterally created by the declaration of the nonowner of the property that the owner of the property is holding it in trust for the nonowner. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 495.) As we have explained already, however, while the result here is dictated in part by the provisions of the National Grange's by-laws, the old California State Grange, from its very creation by the charter the National Grange granted, agreed to be bound by those by-laws, so there was nothing "unilateral" about the result that flowed from the old California State Grange's voluntary submission to those rules. The old California State Grange came into existence because it received a charter from the National Grange to be a part of the Order, and under the National Grange's by-laws "[a]ll Charters issued to the various Granges of the divisions of the Order shall provide that members of each Grange at all times will

37

faithfully comply with the Constitution of the Order, the Articles of Incorporation, By-Laws and Grange Laws and Usage of the various Granges of the divisions of the Order as from time to time adopted." Thus, the very fact that the old California State Grange was a chartered division of the Order required the members of the old California State Grange to faithfully comply with the National Grange's by-laws.

In addition, the old California State Grange's constitution provided that "[t]he State Grange, as a chartered division of the National Grange, shall have the right and power, as the good of the Order requires, to adopt laws for the organization, administration and regulation of the affairs of the various divisions of the State Grange, including laws limiting, defining, and regulating the powers of the various Granges of the divisions of the State Grange, *so long as they do not conflict with the laws of the National Grange*." (Italics added.) The old California State Grange's constitution also provided that "[a]ll candidates for membership and elected officers shall be required to agree at the time of election to membership, or installation in office, that *at all times they will faithfully comply with the Constitution, By-Laws, and Codes of the Grange* at all levels, as from time to time adopted." (Italics added.) Similarly, the old California State Grange's by-laws provided that "[i]t shall be the duty of the officers of the various Granges of the Order to ensure that the Constitution and By-Laws of the Grange at all levels are observed and obeyed . . . ." In these ways, too, the old California State Grange voluntarily subjected itself to the by-laws adopted from time to time by the National Grange, including those provisions that gave the National Master the power to revoke the old California State Grange's charter and provided for the property belonging to the old California State Grange at the time of revocation to be held in trust by the National Grange for the benefit of the State Grange upon its reorganization. In short, all of the documents offered into evidence here, which were undisputed, constitute clear and convincing proof that the old California State Grange voluntarily recognized and agreed that it was subject to the National Grange's by-laws.

38

To the extent the Guild defendants protest that they did not agree to the amendment made to the National Grange's by-laws effective in 2012, which gave the National Master the power to revoke a State Grange's charter for causes other than the reduction of the number of Subordinate Granges to less than six, that fact is of no legal significance. Nothing in the governing documents of the Order, either at the national level or at the state level, gave the old California State Grange the right not to obey changes in Grange law that the State Grange did not approve or agree with. Instead, as we have seen, the old California State Grange and its members agreed in various manners to faithfully comply with *all* Grange law, as adopted from time to time. In the absence of evidence that the amendment to the National Grange's by-laws that took effect in 2012 were not adopted in full compliance with Grange law, the old California State Grange has shown no basis for concluding that it could rightfully assert that it was not subject to the changes in Grange law accomplished by that amendment.

The Guild defendants next argue that there was no clear and convincing evidence that the old State Grange was subject to article XII of the National Grange's by-laws, which governs the disposition of Grange property, because that article, by its own terms, applies to a State Grange only when that grange "surrenders its Charter or otherwise becomes Inactive." According to the Guild defendants, the old California State Grange did not surrender its charter, and it did not become inactive because it "continues to operate." The flaw in this argument is that article V of the by-laws, which addresses the suspension and revocation of charters, specifically provides that when a State Grange's charter has been revoked, "[a]ll remaining assets owned by such State Grange shall be placed in trust as provided for in Article XII of these By-Laws." Thus, article V specifically makes article XII applicable to charter revocations, and therefore the Guild defendants' argument that the old California State Grange was not subject to article XII upon revocation of its charter is without merit.

39

The Guild defendants next argue that "[u]nder longstanding California law, the corporate existence and assets of a secular subordinate corporation are unaffected by the revocation of its charter by a superior body." With respect to "corporate existence," we merely observe that no one is arguing here that the corporate existence of the old California State Grange ended when its charter was revoked. While it was no longer a chartered State Grange within the national fraternal organization known as the Order, the old California State Grange continued to exist as a California corporation notwithstanding the revocation of its charter. But as to the question of whether "longstanding California law" protected the assets that were owned by the old California State Grange from being transferred to the National Grange upon revocation of the old California State Grange's charter, we find neither of the cases cited by the Guild defendants persuasive on that point. The Guild defendants cite *Scott v. Donahue* (1928) 93 Cal.App. 126, 129, for the proposition that " 'where the parent body seeks to dissolve a subordinate lodge by its mere fiat and to confiscate the property of the latter its action will not be upheld in the courts.' " Here, however, as we have explained at length, no "mere fiat" was involved. And as for *Merrill Lodge v. Ellsworth* (1889) 78 Cal. 166, that decision carries little weight because the relationship between the "Grand Lodge" and the local lodge in that case, which was a corporation, was "not very clear from the record." (*Id.* at p. 168.) Here, in contrast, we have a very expansive record of just how the National Grange and the old California State Grange were related to each other by their various constitutions, by-laws, and articles of incorporation. And, as we have explained, under the neutral-principles approach from *Episcopal Church Cases*, those documents provide clear and convincing proof that upon the revocation of the old California State Grange's charter, the property of the State Grange was to be held in trust by the National Grange pending the reorganization of a new State Grange within the Order.

In conclusion, we are persuaded that the trial court did not err in granting summary judgment in favor of the National Grange in this declaratory relief case.

40

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

/s/

Robie, J.

We concur:

/s/

Nicholson, Acting P. J.

/s/

Duarte, J.

41