Filed 11/16/21 P. v. Meza CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078854 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. C1512799) |
| JOSE ANTONIO MEZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Santa Clara County, Paul O. Colin, Judge. Affirmed.

Christopher F. Morales for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jose Antonio Meza of numerous counts of sexual abuse and two counts of battery. The trial court sentenced Meza to 290 years to life in prison plus three years. On appeal, Meza contends that the trial court erred in admitting expert evidence regarding child sexual abuse

accommodation syndrome (CSAAS), and the People committed prosecutorial misconduct during closing argument. In addition, Meza requests that this court independently review his victims' therapy records to determine whether the trial court erred in refusing to disclose them to the defense. Having reviewed the therapy records, we find no error in the trial court's ruling. We find no merit in Meza's remaining claims and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Charges*

Meza was charged with six counts of oral copulation or sexual penetration of A.D., a child age 10 or younger (Pen. Code, § 288.7, subd. (b), counts 1-6), three counts of lewd conduct by force or fear with A.D., a child under age 14 (§ 288, subd. (b)(1), counts 8-10), two counts of lewd conduct by force or fear with Y.D., a child under age 14 (§ 288, subd. (b)(1), counts 11-12), four counts of sodomy with Y.D., a child age 10 or younger (§ 288.7, subd. (a), counts 13-16), one count of sexual intercourse with Y.D., a child age 10 or younger (§ 288.7, subd. (a), count 17), one count of displaying harmful matter to a child, Y.D., with sexual intent (§ 288.2, subd. (a)(2), count 18), and two counts of lewd conduct with G.D., a child under age 14 (§ 288, subd. (a), counts 19-20).[1]

The information alleged as to counts 1 through 17 and 19 through 20 that Meza violated section 288 against more than one victim (§ 1203.066, subd. (a)(7)). The information also alleged as to counts 8 through 17 that

---

[1] Unless otherwise indicated, statutory citations are to the Penal Code. An additional count of continuous sexual abuse of a child, A.D. (§ 288.5, subd. (a), count 7) was subsequently dismissed by the trial court at the prosecutor's request.

2

Meza committed an offense against more than one victim in the present case (§ 667.61, subds. (b), (c), (f) and (e)).

B. *Trial*

1. *Prosecution's Case*

a. *A.D.*

Meza's niece A. was born in 1999 and was 17 years old when she testified.[2] Meza's wife Lorena was A.'s paternal aunt. A., her father, her sister Y., and her three brothers moved into Meza and Lorena's house in 2007 when A. was six or seven years old and beginning first grade. The house had many occupants because Meza's adult children (and their spouses and children) also lived there. Initially, her father slept in the garage, but he subsequently moved out, leaving the children with Meza and Lorena.[3]

When A. first moved in, she and Y. slept on a mattress on the floor of Meza and Lorena's bedroom. Meza and Lorena slept in the bed. Later, after one of Meza's sons moved out, A., Y., and their younger brother moved into a bedroom with bunkbeds. The girls slept together in the bottom bunk, and their brother slept in the top bunk. When A. was in sixth grade, she and Y. slept on a mattress in a closet that had been converted into a tiny bedroom.

A. testified that Meza began touching her inappropriately when she was in third grade. He touched her "many times," "maybe like three to four times" per week. In the beginning, the molestation occurred at night when A.

---

[2]   The parties stipulated that Meza's birthdate is in January 1958, making him more than 21 years of age and more than 10 years older than A. and Y. at the time of the charged crimes.

[3]   Father met Norma T. when living with Meza and would sometimes stay with her. He rented a studio apartment in 2013 and moved in with Norma in 2014.

was sleeping in Meza and Lorena's bedroom, and everyone else was asleep. Meza "would cover [A.'s] mouth," spread her legs apart, and "put his legs on top of [hers] so [she] wouldn't move them." He would take off her pajamas, "stick his fingers inside [her] vagina," "lick [her] in [her] vagina," "touch [her] breasts," and kiss her "[i]n the mouth" with his tongue. A. initially resisted or tried to scream, but there came a time when she "just kind of gave up on screaming."[4] The molestation continued when she moved into the room with the bunk beds. Meza continued to kiss her on the mouth, touch her breasts under her clothes, put his fingers in her vagina, and lick her vagina.

Once, when A. was sleeping in the bunk bed, she awoke and realized Meza "was there with [Y.]." A. was facing the wall and the room was dark, so she could not see her sister and Meza, but she could tell he was there with her sister.

A. testified that G., an unrelated family friend who was younger than her and Y., sometimes spent the night at Meza's house during the period she and Y. slept in the converted closet. G. wanted to sleep with the girls, but Meza said there was not enough room and made G. sleep in his room.

Sometimes after Meza took a shower, he would "dance without his clothes on" in front of the open door, so A. could see his penis. Sometimes when A. was taking a shower, Meza would look through the bathroom window or use a coin to unlock the bathroom door and look at her in the shower. Sometimes A. saw Meza watching pornographic videos on the television in his room. Sometimes he asked her to download pornographic videos onto his computer for him and told her to stay and watch them with him, but she would leave the room. Sometimes Meza would tell A., Y., and

---

[4] A. tried to physically resist Meza but she was scared of him because he was bigger, stronger, and older than her, and he had authority over her.

4

their cousins to take off their clothes and "dance sexy" for him. Meza never said anything to A. "about keeping quiet," but sometimes he would take her and Y. to the store before school, buy them junk food, and give them money, and she felt he did it to "keep [them] quiet."

There was a kid's pool at the house; the water was about three feet deep. The kids, including A., Y., and G., would play in the pool. Meza was the only adult who would go in the kids' pool. Eventually, Lorena told A. she could not go in the pool when Meza was in it. Meza would play a "shark game" with the kids, and he would go under the water, chasing the kids in the pool. During the "shark game," Meza would "grab [G.] by the waist and pull her into him," "in between his legs." G. would tell him to stop.

The last time Meza touched A. inappropriately was when she was 12 years old, at the end of sixth grade. A. told Meza she would tell Lorena what he was doing, and he never molested her again.

When Y. and their younger brother moved out of Meza's house and went to their father's, A. stayed at Meza's. When asked at trial why she did not leave, she said she "want[ed] to go" but stayed because she "felt like everything would go bad," and added that this was after Meza had stopped sexually abusing her.

When A. was a freshman in high school—years after Meza had stopped sexually abusing her—her older brother attempted to assault her; he climbed on top of her in her bedroom and tried to kiss her. Lorena intervened and removed him from the room.

Sometime in late 2014, A. took Lorena's cell phone without permission. When Lorena confronted her, A. initially denied taking it, but then admitted she had. Lorena was upset and struck A.; Lorena also threatened to cancel

5

A.'s upcoming quinceañera.  Shortly thereafter, in October 2014, A. moved out of the Meza residence to live with her father and Norma.

Eventually, A. told Y. that Meza "had been touching [her]," and Y. told her "the same thing had been happening to her."  A. also told Lorena; Lorena responded that A. was "crazy" because Meza "wouldn't be capable of doing that."  A. never brought the subject up to Lorena again.  A. later told Norma about the abuse.

On cross-examination, A. acknowledged that she was interviewed by police officers at least three times beginning in 2015.  During the interviews, she sometimes gave statements that conflicted with her trial testimony.  For example, she told the officer that:  (1) the molestations began in third or fourth grade (rather than third grade); (2) the molestations ended when she was in seventh grade (not at the end of sixth grade); and (3) she was present more than 10 times (not just once) when Meza had molested Y.  A. also gave conflicting statements that her aunt Lorena "usually" and "rarely" checked on the girls every night after they had gone to bed.  In explaining these conflicting statements at trial, A. said that she "felt very uncomfortable trying to talk about something [she] just wanted to get out of [her] head and forget about," and, even after years of therapy, she still felt uncomfortable talking about these subjects in a room full of people.  She also testified that she loved her aunt Lorena and Meza, that she could not remember every time that Meza "touched [her] in a way that he shouldn't have," and she had done her best to give "the facts based on the best of [her] memory."

b. *Y.D.*

A.'s younger sister Y. was born in November 2002 and was 14 years old when she testified.  Y. testified that Meza began touching her when she was in kindergarten and stopped when she was in fifth grade.  It happened "too

6

many times to count." He touched her "private parts," her "butt," and her vagina, over and under her clothing. More than 10 times, he put his penis in her vagina. He also put his penis "inside [her] butt." This happened "a lot of times" and made her feel like she was going to the bathroom "number [two]." The abuse typically occurred when Y. was alone with Meza in the house, both during the day and at night, and sometimes in the backyard next to a shed. One time, it happened at Arroyo Seco, where the family used to go camping.

Meza would dance around the house naked before he would take a shower, ask her to dance for him, offer her money to dance for him, try to watch her when she was taking a shower, and ask her to watch pornography with him on his computer. When he played the "shark game" in the pool, he would touch her "private parts."

Y. would try to resist Meza by pushing him away but it did "not really" work. He told her that she was the reason this was happening to her and it was her fault. When Meza touched her she felt scared; he was bigger, stronger, and older than her, and he was "able to be the boss of [her]." When Meza was molesting her, Y. pulled out all her eyelashes, but she was no longer doing this by the time of trial.

At some point, Y. and some of her siblings went to live with her father, but there was another man living at her father's residence who sexually abused her, so she returned to Lorena and Meza's house. Then, in October 2014, she moved out of the house permanently and went to live with her father and Norma. Y. loved her aunt Lorena and Meza and felt close with everyone living in that house. Other than what Meza did to her, she liked living there.

Y. eventually disclosed the abuse to A. and to Norma. She later spoke with police officers several times, but she did not initially disclose everything

7

that Meza had done. Y. never spoke with Lorena about the abuse, and she never saw Meza touch A. "in a bad way."

### c. *Norma T.*

Norma T. testified that she began dating Y. and A.'s father in December 2008. When Y. was living at Meza's home, Norma noticed that Y. was pulling her eyelashes from her eyelids. Y. pulled out all her eyelashes. Norma and the girls' father moved in together in the summer of 2014, and the girls came to live with them in October of that year. During May of 2015, A. told Norma that Meza had touched her inappropriately, but A. did not provide details. Norma later talked to Y., and Y. said Meza had touched her too. Norma called Child Protective Services (CPS) to report Meza and enrolled the girls in therapy. Afterward, there were times when the girls would tell Norma more about what Meza had done to them. Norma would then call the Santa Clara Police Department and report the girls' statements to Detective Hagg. Y. no longer pulls out her eyelashes.

### d. *G.D.*

G. was born in 2005 and was 11 years old when she testified. Lorena was G.'s mother's godmother, and G. called Meza and Lorena her "grandpa" and "grandma" even though they were not her actual grandparents. G. testified that she sometimes slept over at Meza's home. She would either sleep "in [her] grandma's bed" or with Y. and A. When she slept in the bed, she would either sleep "in the middle" or she would sleep with Meza and Lorena would sleep on the floor. G. initially testified that Meza never touched her anywhere he should not have touched her, but she then said that he "slap[ped]" her "butt." It happened more than once but less than five times. She acknowledged she had spoken with a police officer and had demonstrated to the officer how he had touched her "butt." She

8

acknowledged telling the officer that Meza would leave his hand on her butt for "like three seconds." G. acknowledged she had previously said that when Meza played the "shark game" with her in the pool, he would touch her butt and she would tell him to stop. However, at the time she testified, she did not remember Meza ever touching her butt when they were playing games in the pool.

G. acknowledged she had written a note to the court during a pretrial proceeding. The note said, "Dear Judge[,] [¶] I'm [writing] this because I get nervous when I speak. My [grandpa] [Meza] is [a] very nice man. I miss him. It makes me depress[ed] knowing [he is] in jail for something he never did."[5] G. acknowledged she previously said that no one had asked her to write the letter, but at trial testified that it was her mother's idea to write the letter and her mother "help[ed] [her] choose what words to say in it." G. did not remember Meza ever asking her to "dance sexy."

On cross-examination, G. reiterated that she did not find Meza's behavior "bad" or "weird." She said he was just playing with her and hugging her.

e. *Detective Hagg*

Detective Hagg of the Santa Clara Police Department is assigned to investigate crimes against children, including sexual assault and child molestation cases. After receiving a report of suspected child molestation from CPS, he interviewed A. and Y. at their schools in June 2015. After that "very basic, not very detailed" initial interview, the detective interviewed the girls later that month at the Children's Interview Center, where suspected

---

[5]     The trial court instructed the jury that the note was offered not for the truth of its contents but for the limited purpose of considering whether G. "is believable and whether she has a bias in this case."

victims of child abuse are typically interviewed. He interviewed the girls a third time in April 2016 after receiving additional information from Norma. During his investigation, he had several conversations with Norma and also interviewed her.

When he interviewed Y., she disclosed that Meza touched her in an inappropriate way; however, her demeanor during the interviews indicated to him that she was reluctant and had difficulty telling him what had happened to her. She appeared very shy, did not make eye contact, and would often shrug her shoulders or shake her head yes or no rather than giving full verbal answers to questions. There were long periods of silence when she would stare at the ground or look away and not respond to questions. She moved her hair in front of her face and hid her face in a book. She said she was too embarrassed to answer and that it was too hard to talk. Detective Hagg tried different techniques to ease her difficulty, including giving her a notebook to write her answers (rather than verbalizing them) and turning her chair to face the opposite direction so she would not have to look at her interviewer. When he asked her about pulling out her eyelashes, she said she did not know why, but she also said it was related to the sexual abuse Meza had inflicted.

Detective Hagg also interviewed G. who was in fourth grade at the time. A videotape of the interview was played for the jury. During the interview, G. told the detective that Meza "would just come up to [her] and touch [her] butt" outside her pants. G. demonstrated the touch for Detective Hagg: "She stood up and cupped her hand and placed it on her butt and left it there for several seconds." G. told Meza to stop but he continued to do it. It made her feel uncomfortable. This happened fewer than five times. Detective Hagg was present at the pretrial hearing when G. presented a

10

letter to the judge. She initially said it was her idea to write the letter and give it to the judge, but later in the hearing, she admitted it was her mother's idea.

### f. *Dr. Carmichael*

Dr. Blake Carmichael testified as an expert in CSAAS. Dr. Carmichael holds a doctoral degree in clinical psychology and his knowledge of CSAAS is based on his formal training and his extensive personal observations of sexually abused children.

Dr. Carmichael testified he was not familiar with the facts of this case, he had not interviewed any of the victims in this case, he did not know the defendant in this case, he had not seen the police report in this case, he had not reviewed any materials related to this case, and he had not conducted any investigation into this case.

Dr. Carmichael explained that CSAAS is an educational tool to help people better understand the variety of ways children might react to sexual abuse or disclose sexual abuse. Dr. Carmichael described five components of CSAAS: secrecy; helplessness; entrapment or accommodation; delayed or unconvincing disclosure; and retraction or recanting. Dr. Carmichael emphasized that these components are not observable in every case.

Dr. Carmichael explained that CSAAS cannot be used as a diagnostic tool to determine whether abuse has occurred, but rather that it should be used only to educate people—including jurors—who might have a preconceived notion of how an abused child might behave and about the differing ways that children react to sexual abuse.

Regarding secrecy, Dr. Carmichael testified that a perpetrator of sexual abuse ensures that his conduct is not known to anyone other than the victim so that he can continue to have access to the child. Some abusers threaten to

11

harm the victims if they disclose the abuse, while others ingratiate themselves with the victims through gifts and acts of kindness and attention. Most sexually abused children are molested by someone they know. Having a personal relationship with their abuser complicates the consequences a child might face if they disclose the abuse because the child may fear the consequences or feel responsible for what is happening to them.

Regarding helplessness, Dr. Carmichael testified that there is a power differential between the abuser, who is bigger, stronger, and more sophisticated, and the child victim, who is smaller, weaker, inexperienced, and vulnerable. Some children love their abuser despite the abuse, and they fear the abuser will get in trouble if they disclose the abuse. This can make the victim of abuse feel helpless about what is happening to them.

Regarding entrapment and accommodation, Dr. Carmichael testified that a victim who is abused in secret and feels helpless or powerless to stop it is entrapped in the situation and engages in different means to accommodate the trauma he or she is experiencing. Victims might avoid certain places or change their dress to appear less appealing to their perpetrator. Some children cope by disassociating from their environment during the abuse to distance themselves from the shame, fear, and guilt, by "numb[ing] themselves" or staring into the distance and not paying attention during the act.

Regarding unconvincing or delayed disclosure, Dr. Carmichael testified that most children do not talk about the abuse right away. Studies show that between 60 and 75 percent of victims do not report abuse within one year. Between 40 and 60 percent of victims do not report abuse until after they have reached age 18. Some victims disclose abuse incrementally to see how their statements are received. As an example, a child might tell a trusted

12

adult that an abuser "is kind of mean to me." Depending on the adult's reaction, the child might not say more. Victims commonly minimize what happened to them and may disclose more significant types of abuse over time. Children do not always remember specific details of sexual abuse, particularly when the abuse occurs over time.

Regarding retraction, Dr. Carmichael testified that a minority of victims will retract legitimate disclosure of sexual abuse, typically in response to family pressures.

The prosecutor posed a series of hypothetical questions. In response, Dr. Carmichael testified that a child victim of sexual abuse may not disclose the abuse even if it is happening in the home when others are present, and the child may not cry out while the abuse is happening. The child may still "have feelings of love for a perpetrator" even if she did not like what the abuser did to her, explaining that "although we might expect for us to define a relationship by the trauma or the negative aspects, victims don't necessarily do that the way we might expect . . . therefore that can be complicated for the kid to deal with." Child victims may maintain secrecy of the abuse if they are given candy, presents, or other favorable treatment. A child may not tell an adult that their abuser showed them pornography. Showing a child pornography is a common method of "interjecting sexual content or . . . sexual touch in the relationship." Another common method of integrating sexual touch and contact into the relationship is through game play; an abuser may interject inappropriate touching during play without the child understanding that the touching was "shocking or offensive." When a perpetrator uses force to molest a child, it can contribute to the victim's feeling of helplessness. A victim of abuse may choose to stay in a household with an abuser if she otherwise had good relationships and other needs were

13

met. Although it may not be "just as common," a victim of abuse might appear unaffected and happy rather than displaying emotions one might expect, like anger, fear, or shame. One child may cry, sob, or freeze during a report of abuse, while another child might giggle; this is due to an inability to deal with foreign emotions or discomfort. It is not uncommon for a child to avoid eye contact or "kind of shut[] off in some manner" when disclosing abuse, as a way of distancing themselves. Some victims may engage in self harm as a coping method to alleviate the internal distress they experience from sexual abuse. A child who attempts to disclose and receives a dismissive response, such as being called "crazy," may result in delaying future disclosure until they feel they are being understood or supported. A child may recant an allegation of abuse if her "mother asked her to write a letter to the judge telling the judge that nothing bad happened" because "family pressure . . . has [a] very significant influence on a child's retraction."

On cross-examination, Dr. Carmichael reiterated that he was not familiar with the facts of this case, and that CSAAS is merely a manner of educating people about "this population of kids," and cannot and should not be used to prove that a person is a victim of sexual abuse.

g. *Mary Ritter*

Mary Ritter testified as an expert in forensic nursing, including the collection and preservation of evidence in sexual assault cases and determining whether findings are consistent with sexual assault. Ritter performed Sexual Assault Response Team (SART) examinations on both A. and Y. in May of 2016. She did not find any evidence of injury to either girl's vaginal or anal areas. Given the passage of time between the reported abuse and the examinations, she would not expect to find any evidence of injury because vaginal injuries heal within two to four weeks and anal injuries

14

begin healing "right away." She acknowledged, however, that "[a] significant tear might leave a mark of some sort, a scar or a healed area," that an examiner would recognize as resulting from penetrating trauma even months or years later.

### 2. *Defense Case*

Three of Meza's daughters-in-law and Meza's wife (Lorena) testified on behalf of the defendant. They testified that they never witnessed any inappropriate conduct between Meza and the girls; A. and Y. enjoyed living with Meza and were not fearful of him; and Meza was not an overly affectionate person. Lorena also denied that A. ever told her Meza was touching her or Y. inappropriately. Initially, Lorena testified that she never saw the girls hug or kiss Meza, but later testified that she had seen them be affectionate with Meza. There were inconsistencies in the testimony of these four witnesses as to whether they met in advance to discuss their testimony shortly before trial—two of them acknowledged some type of joint meeting among themselves, whereas Lorena and one of the daughters-in-law denied it.

Meza's granddaughter, who was 11 years old at the time, testified that she was close with Y. when they lived together at the Meza residence, and Y. seemed happy to be living there and did not appear to be afraid of Meza. She never heard any noises coming from A. and Y.'s room that made it seem like something wrong was going on in there.

G.'s mother testified that she has a close relationship with Meza and his family; Lorena is her godmother and she considers Meza to be "like a father" to her. G. slept over at Meza's home on multiple occasions; at the mother's request, G. would sleep in Lorena and Meza's bedroom because the mother thought "she was going to be safer in her room than in anybody else's

15

room." Prior to the police interviewing G., the mother had talked to G. about "good touch, bad touch" on two occasions. She was surprised when police came to interview G. She helped G. write a letter to the judge prior to a pretrial hearing in August 2016. She gave G. "an option" to write the letter so that G. "could speak less" but the words in the letter were G.'s with one exception—she suggested using the word "depress" [*sic*] rather than G.'s word, "sad," when describing how G. felt about Meza being accused "for something he never did." She talked to G. about whether Meza had touched her inappropriately before the police interviewed her in June of 2015, and G. told her Meza had not touched her inappropriately. She did not believe Meza engaged in inappropriate sexual conduct. In fact, she testified there was nothing that could change her positive opinion of the defendant.[6]

Meza testified in his own defense, denying all allegations of sexual abuse or inappropriate contact with A., Y., and G. Meza testified over the course of two days, changing various portions of his testimony as to the following subjects: pornography on his television, being alone with the children, showing physical affection, playing in the pool, touching buttocks, and camping at Arroyo Seco. Meza initially denied showing Y. pornography and testified he had no pornography at home, and no subscriptions to

---

[6] The following exchange occurred during cross-examination of this witness: "Q. If you found out that the defendant did all those things [touch a child's private parts, orally copulate a child, and sodomize a child], would that change your opinion? [¶] A. No. [¶] Q. Even if he did all these things, that wouldn't change your opinion about who he is? [¶] A. No. [¶] Q. Aside from your daughter, you haven't talked with the other girls who have made these allegations against the defendant, have you? [¶] A. No. [¶] Q. Would that make a difference to you at all to know what they had to say? [¶] A. No. [¶] Q. So there's nothing that could change your opinion— [¶] A. No. [¶] Q. —about the defendant? [¶] A. No."

pornographic programming for his television. He testified he did not have a subscription to any service for his television or cable "on demand." He testified his cable package did not include any programming for pornography, but there might be some nudity on "romance programs" or "novelas." If you "flip through the channels" you might find a program with "kisses or hugs" but he never purposefully showed Y. or A. any of that programming. He testified he did not know how to download movies or pictures from the Internet. On cross-examination, Meza testified there was a time Y. walked into his room and saw naked people on television, but then claimed that "they were not naked," and he asked her to leave. When asked why he asked her to leave if there was no nudity, Meza claimed it was because she was blocking the television. The next day, on redirect, Meza testified he remembered he once made Y. leave his bedroom because he was watching television and there were "some people with little clothes on." He continued to insist it was not pornography. Regarding being alone with the children, on direct examination, Meza testified "there were always other adult[s] in the house" when he stayed home with the children. On cross-examination, he admitted that sometimes he was alone with the kids at the house, watching or looking after them, with no other adults in the house. Meza also testified he was never alone with Y. in the backyard—not once in seven years. On redirect the next day, he testified he was alone with Y. in the backyard "at some point, but I don't remember." Regarding demonstrations of physical affection, Meza initially denied ever hugging or kissing either girl. The next day, he admitted he hugged the girls and showed affection in return to their shows of affection; through gestures he indicated he did not give full hugs, with arms wrapped tightly, but some lesser form of hugs, or pats or touches. Regarding the pool, Meza initially denied playing with A. and Y. in the pool and claimed

17

he only played with the boys.  He testified they did not play a "shark game" and claimed the girls "invented that themselves."  He testified he would chase the kids and push them in the swimming pool.  On cross-examination that day, Meza admitted he would get in the pool with "the little girls," his granddaughters.  He initially testified no children ever got on his back in the pool.  Then he testified that "the girls" (an apparent reference to his granddaughters, not A. and Y.) would get on his back in the pool and he would try to shake them off and wrestle with them.  When asked if that was the "shark game," Meza testified it was not, and they called it the "horse game."  He then denied chasing the kids around the pool and trying to grab them.  The following day during redirect, Meza testified that he played the "horse game" with his granddaughter and G. in the pool, they would jump on his back, and he would also push them or pull their legs when they were in the pool.  He said he did not remember this the prior day he testified because he was very tired and "had a lot of pressure on [his] mind."  On cross-examination, Meza stated he had never touched G.'s buttocks, only her back.  On redirect the next day, he described that he would do "a palmada" to his children, which through gestures he showed was a clap to the hip or rear area of the body.  He testified he possibly could have done that with G., but he never left his hand there for three seconds as G. demonstrated during her interview with the police.  On direct examination, Meza testified only the whole family would go for walks away from the Arroyo Seco campsite, and he never took Y. by herself to an isolated area.  On cross-examination that same day, he testified he never left the main campsite with a group of kids, but then said he would walk off from the campsite with a group of little kids.  On redirect the next day, he testified he would walk away from the campsite with a group of children but he could still see the campsite and he would

18

remain "inside of the camp." On recross, he indicated he would lead the kids away from the campsite. Meza testified he changed his answers because he felt pressure the previous day and indicated he realized his answers sounded strange.

### 3. *Closing Arguments*

The prosecutor argued that the jury should disregard "unreliable information." In contrast to the unreliable, biased, inconsistent, "confused" or "misleading" information presented by defense witnesses, the prosecutor argued that A. and Y. presented credible testimony.

The defense argued there was no physical evidence of sexual abuse and no evidence that anyone witnessed any inappropriate behavior, which made it unlikely that sexual abuse could have occurred repeatedly over the years as A. and Y. claimed. The defense further argued that the girls only made allegations of sexual abuse after they moved out of Meza's home and were "placed under the influence of Norma for months," and they may have been motivated to fabricate the allegations by the "cancellation of the quinceañera" and because A. was sexually assaulted by her brother.

In response, the prosecutor argued the defense was attempting to distract the jury from the evidence, and, based on the evidence, the jury could conclude that both A. and Y. were sexually abused by Meza as charged.

### 4. *Verdict and Sentencing*

The jury convicted Meza on all counts of sexual abuse related to A. and Y. (Counts 1-6, and 8-18). The jury found Meza not guilty of lewd conduct with G. (§ 288, subd. (a)) but guilty of the lesser included offense of battery (§ 242) on counts 19 and 20. As to counts 8 through 17, the jury also found true the allegations that Meza committed offenses against more than one victim in the present case (§ 667.61, subds. (b), (c), and (e)). The trial court

19

sentenced Meza to a total prison term of 290 years to life consecutive to three years, comprised of six consecutive terms of 15 years to life (counts 1-6), five consecutive terms of 15 years to life (counts 8-12), five consecutive terms of 25 years to life (counts 13-17), plus one consecutive term of three years (count 18). The trial court additionally imposed two concurrent six-month sentences (counts 19-20).

## DISCUSSION

## I

### *CSAAS Evidence*

Meza contends the trial court erred in allowing an expert to testify regarding CSAAS evidence. We disagree. Even assuming the trial court erred in admitting the testimony, it was harmless.

A. *Additional Background Information*

The prosecutor moved in limine to admit expert testimony regarding CSAAS. The prosecutor argued the evidence was admissible to disprove common myths and misconceptions about children's reactions to child abuse, including misconceptions regarding a child's failure to report or delayed reporting of the sexual abuse, inconsistent statements regarding the abuse, continuing to live with or visit the abuser, and recanting initial reports of abuse.

Meza moved in limine to exclude CSAAS evidence. He argued CSAAS evidence has been "discredited," "proven to be erroneous[,] and based upon false assumptions." He further argued CSAAS evidence is not necessary or credible because there is no evidence that members of the public have misconceptions about how children react to being molested. If the testimony were allowed, Meza argued it should "be narrowly limited in scope and subject to a special jury instruction."

The trial court referenced the myths that "children don't report [sexual abuse] for a long period of time," or they change their stories or recant, "so they must have made it up." The court ruled a "sanitized" expert—one that did not know the facts of the case—could testify regarding CSAAS, and the court would instruct the jury it could only consider the evidence for a limited purpose.

After designating Dr. Carmichael as an expert in the area of CSAAS, the trial court instructed the jury that his testimony was only received for a limited purpose and must not be considered by the jury as proof that the alleged victims' molestation claims are true or not. The trial court further instructed:

> "[CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience. [¶] As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. You should consider the evidence concerning [CSAAS] and its effect only for the limited purpose of showing, if it does, that the alleged victims' reactions, as demonstrated by the evidence, are not inconsistent with having been molested."

Dr. Carmichael then proceeded to testify as described *ante*. At the conclusion of evidence, the jury was instructed again as follows:

> "Evidence has been presented to you concerning [CSAAS]. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true.
>
> "[CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The research begins with the assumption that a molestation has occurred, and seeks to describe and explain

21

common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent.

"The People have the burden of proving guilt beyond a reasonable doubt.

"You should consider the evidence concerning [CSAAS] only for the limited purpose of showing, if it does, that the alleged victim's reactions as demonstrated by the evidence are not inconsistent with her having been molested." (See CALJIC No. 10.64.)

The jury was further instructed pursuant to CALCRIM No. 332 that it was not required to accept the expert's testimony, it could "disregard any opinion that [the jury] find[s] unbelievable, unreasonable, or unsupported by the evidence," and it was the jury's duty to decide whether an assumed fact presented by way of a hypothetical question had been proved.

B. *Governing Legal Principles*

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence" to the action, including "evidence relevant to the credibility of a witness." (Evid. Code, § 210.) Expert testimony is admissible where it relates to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, § 801, subd. (a).)

Expert testimony on "the common reactions of child molestation victims," known as CSAAS evidence, "is not admissible to prove that the complaining witness has in fact been sexually abused." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) However, "it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Ibid*.) " 'Such expert

testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426 (*McDowell*).) An appellate court "will not disturb the [trial] court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

C. *Analysis*

Meza raises two primary challenges to the admission of the CSAAS evidence. First, he urges this court to hold that CSAAS evidence is "inadmissible for any purpose in California." Second, he claims that even if CSAAS evidence is generally admissible, the evidence here should have been excluded because the expert "[i]mproperly [p]rofiled" the complaining witnesses and the jury likely misused the evidence to conclude the defendant was guilty. We reject these contentions.

1. *Admissibility of CSAAS evidence in general*

"CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)[7] As the *Munch* court recently summarized, our state "courts have

---

[7] Although *McAlpin* did not deal directly with the admissibility of CSAAS testimony—and instead addressed the admissibility of expert testimony regarding the behavior of a parent of a molested child—our Supreme Court cited with approval several Court of Appeal decisions that upheld the admission of CSAAS evidence. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301 & fn. 4.)

long recognized the well-established relevance, necessity, reliability, and importance of this evidence." (*Id.* at pp. 472-473 [collecting cases].) Meza recognizes "California courts have accepted the admissibility of CSAAS evidence." He nonetheless contends CSAAS evidence should be excluded for all purposes in California because myths and misconceptions about child sexual abuse victims "are no longer prevalent in society and were not held by the jurors in this case." Meza cites no factual authority for these assertions and his arguments are not persuasive in any event.

The *Munch* court rejected the same argument advanced by Meza here. In that case, the defendant claimed "the trial court erred by admitting expert testimony on CSAAS because it is irrelevant and 'the public no longer holds the presumed misconceptions this testimony purports to address.'" (*Munch*, *supra*, 52 Cal.App.5th at p. 468.) The *Munch* court rejected that claim, noting *McAlpin* is "binding on all lower courts in this state." (*Ibid.*; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We agree with the *Munch* court's analysis.[8] Meza has offered no justification for departing from established precedent based on his speculation that CSAAS evidence is no longer needed to dispel myths and misconceptions about child sexual abuse victims. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172 (*Lapenias*) [rejecting defendant's argument that " 'CSAAS testimony is no longer necessary because the public no longer harbors misconceptions about

_____

8    In *People v. Brown* (2004) 33 Cal.4th 892, 905-906, the Supreme Court again cited *McAlpin* with approval. The Court analogized CSAAS testimony to expert testimony regarding common behaviors of domestic violence victims, and extended the same principles to find testimony regarding domestic violence victims admissible. (*Id.* at pp. 906-907.) (See *People v. Perez* (2010) 182 Cal.App.4th 231, 245 [Supreme Court's reasoning in *McAlpin* and *Brown* regarding admissibility of CSAAS testimony remains binding on the Courts of Appeal].)

the behavior of sexually abused children,' " where defendant's assertion that misconceptions were no longer present "was not established prior to the trial court's evidentiary ruling"].) In light of this established precedent, we decline Meza's invitation to rule that the entire body of CSAAS evidence is "inadmissible for any purpose in California."

Even assuming some of the jurors in this case did not hold the same misconceptions regarding child sexual abuse victims, Meza's claim still fails. As the court recognized in *McAlpin*: " 'The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' " (*McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.) Meza has not shown that expert testimony " ' "would add nothing at all" ' " to the jury's understanding of commonly held misconceptions about child sexual abuse. (*Id.* at p. 1300.) "Moreover, even if we were to assume that all the empaneled jurors were fully aware of all five components of CSAAS, we would then find Dr. Carmichael's testimony to be merely cumulative and therefore not prejudicial." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) Regardless of the jurors' level of understanding, they are not likely to have the same knowledge of the behavior of child sexual abuse victims as an expert on CSAAS. Contrary to Meza's contention that CSAAS evidence is no longer necessary and should be excluded for all purposes, this expert

testimony remains helpful to the jury and is therefore relevant and admissible. (Evid. Code, § 801, subd. (a).)

Meza contends there are "inherent problems" with CSAAS evidence, but the cases he cites do not support his claim that all CSAAS evidence should be ruled inadmissible. In *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*), where a victim delayed reporting abuse by a family member and recanted her allegations of abuse at trial, the court found CSAAS testimony "was properly used to dispel certain common misconceptions regarding the behavior of abuse victims." (*Id.* at pp. 951-952, 956.) The court recognized that CSAAS evidence may be "misunderstood and misapplied by a jury," but it did not conclude the evidence should be excluded. (*Id.* at p. 958.) Instead, it found that a simple instruction, similar to that used in this case, "would clearly define the proper use of such evidence and would prevent the jury from accepting the expert testimony as proof of the molestation."[9] (*Ibid.*) Similarly, in *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*), the court stated that "CSAAS testimony has been held *admissible* for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (Italics added.) The appellate court concluded the trial court "handled the matter carefully and correctly" by instructing the jury in the same fashion as the trial court in the instant case: the jury was immediately admonished after the expert's testimony that "it was to consider CSAAS testimony only for the limited purpose of showing, if it did, that the

[9]    The court found the jury should be "instructed that (1) [CSAAS] evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at p. 959.) This is the same type of instruction used in this case.

26

alleged victim's reactions as demonstrated by the evidence were not inconsistent with her having been molested"; the jury was "further admonished that the People still had the burden of proving guilt beyond a reasonable doubt, and CSAAS research was based upon 'an approach that is completely different from that which you must take in this case' "; the jury was told that CSAAS "research begins with the assumption that a molestation has occurred and seeks to explain common reactions of children to that experience" but the jurors had to presume the defendant innocent; and the jury was instructed at the end of the evidence that "CSAAS testimony was 'not received and must not be considered by you as proof that the alleged victim's molestation claim is true.' " (*Id.* at pp. 1745-1746.) Finally, Meza cites one federal case and two out-of-state cases, but we are not bound to follow those decisions. (*Munch, supra*, 52 Cal.App.5th at pp. 468-469 [following *McAlpin* and rejecting defendant's reliance on out-of-state authorities that may disagree with it]; see also *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1086 [" 'Where out-of-state authority is at odds with California law, it lacks even persuasive value.' "]; *National Grange of Order of Patrons of Husbandry v. California Guild* (2017) 17 Cal.App.5th 1130, 1155 [federal circuit court opinions not binding on California courts].)[10]

---

[10] Meza cites *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270 but the case arose in a different context and the court did not actually hold CSAAS evidence is never admissible. (*Id.* at p. 1273.) Although not cited by Meza, the Ninth Circuit more recently stated, "[W]e have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." (*Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991; see also *Munch, supra*, 52 Cal.App.5th at p. 470 ["Ninth Circuit decisions are consistent with *McAlpin.*"].)

In sum, we reject Meza's categorical challenge to the admissibility of CSAAS evidence in all cases in California.

## 2. *Scope of Dr. Carmichael's CSAAS testimony*

Meza contends that, even if CSAAS evidence is generally admissible, Dr. Carmichael exceeded the boundaries of permissible CSAAS evidence in this case. Specifically, he contends it was error to "allow[] the CSAAS expert to answer hypothetical questions that closely track the facts" of the case, because this created a " 'profile' " of a child sexual abuse victim which the "jury likely misused" as a "diagnostic tool to find that A[.], Y[.], and G[.] were credible" and Meza was guilty.[11]

Some aspects of the expert's testimony—which too closely mirrored the facts of the case or were not tailored to counter "a specific 'myth' or 'misconception' suggested by the evidence"—were problematic. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*).) The expert's discussion of a victim's self-harming behavior, "like cutting themselves or anything along those lines" was not tied to any particular myth or misconception on this record. In addition, the expert responded to certain hypotheticals that *exactly* matched the facts of the case, testifying that a

---

11    Defense counsel objected to nearly all the hypothetical questions posed to the expert. The Attorney General contends counsel did not preserve the issue for appeal because he failed to explain the basis of his objections at trial. Meza counters that, if counsel's objections were deficient, counsel's performance was ineffective. We conclude that the objections lodged in limine and at trial were sufficient to preserve Meza's claims for review. (Evid. Code, § 353; see *People v. Morris* (1991) 53 Cal.3d 152, 187-190.) We also reject Meza's contention that counsel provided ineffective assistance because Meza has failed to establish he was prejudiced by the evidence. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; see *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [generally, for purposes of a claim of ineffective assistance of counsel, prejudice must be affirmatively proved].)

child who attempts to disclose and receives a dismissive response, such as being called "crazy," may result in delaying future disclosure until they feel they are being understood or supported and a child may recant an allegation of abuse if her "mother asked her to write a letter to the judge telling the judge that nothing bad happened." (See *People v. Jeff* (1988) 204 Cal.App.3d 309, 338, 339 [error to permit expert to answer hypothetical questions "incorporating the exact same facts and details" as testified to by the victim].)

Viewed as a whole, however, we reject Meza's claim that the jury was likely to misuse the CSAAS evidence "as a diagnostic tool to find that [the victims] were credible, and thus [Meza] was guilty." The majority of the expert's testimony was proper. Discussion of a sexual abuse victim's delayed disclosure, inconsistent statements, and willingness to continue living with the perpetrator despite the abuse addressed jurors' potential misconceptions that these circumstances might indicate fabrication of the victim's story. Dr. Carmichael properly helped the jury understand that abuse victims often do not immediately report abuse, and when they do disclose, their initial stories are not always detailed or perfectly consistent with later versions. He also properly explained children may have conflicted feelings about an abuser that might lead them to remain in an abusive situation. This expert testimony regarding victims' delayed disclosure, the manner of disclosure, the effect of a close relationship with the abuser on disclosure, and responses to sexual abuse, was presented in general terms regarding typical cases rather than this case.

It is clear from Dr. Carmichael's testimony as a whole that he was not there to provide an opinion that Meza sexually abused A., Y., or G. The expert repeatedly emphasized he was not familiar with the victims or the facts in this case. He explained that his knowledge of CSAAS was based on

29

his formal training as a psychologist and his professional experience. He further explained that CSAAS is an educational tool to help people better understand the variety of ways children might react to sexual abuse or disclose sexual abuse, and emphasized that CSAAS cannot be used as a diagnostic tool to determine whether abuse has occurred. This testimony was properly "limited to discussion[s] of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and [did] not extend to discussion and diagnosis of the witness[es] in the case at hand." (*People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100; see also *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 ["[w]here, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence"]; *Housley*, *supra*, 6 Cal.App.4th at pp. 955-956 [where the CSAAS expert "advised the jury, both during her direct examination and again during her cross-examination that she had never met [the victim] and was unfamiliar with the particulars of the case," it was "unlikely the jury would interpret [the expert's] statements as a testimonial to [the victim's] credibility"].)[12]

Even assuming the trial court erred in admitting all of the CSAAS evidence, the error was harmless because it is not reasonably probable that Meza would have obtained a more favorable outcome with the evidence excluded. (*Bowker*, *supra*, 203 Cal.App.3d at p. 395 [analyzing error in admitting CSAAS evidence under *People v. Watson* (1956) 46 Cal.2d 818, 836

_____

[12] Meza did not cite to Evidence Code section 352 in his opening brief; he cites this statute for the first time in reply to argue that the probative value of CSAAS evidence "was substantially outweighed by the probability of undue prejudice." Although it is unnecessary for us to consider this claim (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 157-158), we reject it because, as explained *post*, any error in admitting the evidence was harmless.

(*Watson*)].)  The trial court was careful to ensure the jury did not use Dr. Carmichael's testimony for an improper purpose.  The jury was expressly instructed *not* to consider the evidence as proof that the alleged victims' molestation claims were true.  The trial court repeatedly explained that "[CSAAS] research is based upon an approach that is completely different from that which you must take to this case.  The syndrome research begins with the assumption that a molestation has occurred and seeks to describe and explain common reactions of children to that experience.  [¶]  As distinguished from that research approach, you are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt."  The jury was further instructed to consider the evidence "only for the limited purpose of showing, if it does, that the alleged victims' reactions, as demonstrated by the evidence, are not inconsistent with having been molested."  The jury was instructed on these limitations in the use of CSAAS evidence before, during, and after Dr. Carmichael offered his expert testimony.  We presume the jury understood and followed these instructions regarding the appropriate limits of Dr. Carmichael's testimony.  (*People v. Cain* (1995) 10 Cal.4th 1, 34.)

Moreover, independent of the CSAAS evidence, the evidence against Meza was very strong.  A. and Y. were 17 and 14 years old, respectively, when they testified at trial.  They both provided detailed accounts of the sexual abuse they suffered over the course of several years at the hands of their uncle.  Outside the presence of the jury, the trial court remarked that it perceived A. and Y. as credible witnesses, and, at sentencing, the court related that both girls' testimony was "powerful" and Y.'s testimony was "compelling."  It is unlikely the jury would have interpreted the evidence differently than the court.

31

Meza's defense, on the other hand, was comparatively weak. The defense tried to call A. and Y.'s credibility into question by highlighting minor inconsistencies in their testimony compared to their earlier interviews. But the jury could reasonably conclude these discrepancies were unsurprising given the passage of time and minimal nature of the inconsistencies. The defense's theory that the girls fabricated the allegations because Meza's wife was going to cancel A.'s quinceañera was farfetched as the prosecution pointed out in closing argument. And while Meza points to the lack of physical evidence as a weakness in the prosecution's case, the expert who performed the SART examinations testified she would not expect to find evidence of sexual abuse that had occurred years prior to the examination. By contrast to the compelling testimony of A. and Y., Meza's testimony was filled with significant discrepancies. He changed his testimony overnight on numerous points, admitting his initial answers might sound strange to the jury. Because the evidence overwhelmingly supports Meza's guilt, it is not reasonably probable that admission of the CSAAS evidence affected the judgment.[13]

In sum, we conclude the trial court did not prejudicially err in admitting CSAAS evidence for the limited purpose of dispelling misconceptions about how child victims react to sexual abuse. We reject Meza's categorical challenge to CSAAS evidence and reject his invitation to adopt contrary views from other jurisdictions. We further conclude that any

---

[13] Meza contends his constitutional rights were violated because the expert's testimony "connect[ed] CSAAS to the specific facts of the case." Meza did not raise this claim in the trial court and thus forfeited it. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-22.) It also lacks merit. The "introduction of CSAAS testimony does not by itself deny appellant due process." (*Patino, supra*, 26 Cal.App.4th at p. 1747.) We conclude Meza has not established a constitutional violation.

expert testimony that exceeded the permissible scope of CSAAS evidence did not violate the defendant's constitutional rights, and any error in admitting the evidence was harmless.

II.

<em>Allegations of Prosecutorial Misconduct</em>

Meza contends the prosecutor committed prejudicial misconduct during closing argument by: (1) mischaracterizing the burden of proof; (2) maligning defense counsel; and (3) vouching for prosecution witnesses. We reject these claims. We further conclude that, even if the prosecutor's statements amounted to misconduct, Meza was not prejudiced because any assumed error was harmless.

A. *Additional Background Information*

The prosecution began its closing argument by explaining that the jury's role was to determine "the truth," which required the jury to "wade through currents of unreliable information." The prosecutor argued the defense witnesses were "unreliable": Meza's daughters-in-law "were admittedly biased," having "met as a group shortly before they testified to get their stories straight"; G.'s mother "was so biased in her testimony that her opinions about the defendant wouldn't even change, even if she knew it were true that the defendant had sodomized and orally copulated little girls"; Meza's wife provided confused (at best) or misleading (at worst) information; and Meza himself "literally changed his story overnight." The prosecutor referenced the "single witness rule,"[14] argued the jury could obtain the truth "in the words of three girls"—A., G. (in her first interview with the police),

---

[14] The jury was instructed: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (See CALCRIM No. 301.)

33

and Y.—and then concluded "[t]he single witness rule was made for victims like [A.] and [Y.]." After summarizing the evidence in more detail, discussing the elements of the offenses, and referencing the jury instructions, the prosecutor returned to this theme, arguing: "The single witness rule was made for witnesses like [A.] and [Y.]. There's no dispute that that testimony was legitimate. It was honest. It was truthful."

The prosecutor then asked some rhetorical questions suggesting A. and Y. had no motive to lie:

> "One question I have for you all is what's their motive to lie? Did you hear any evidence of a motive to lie in this case? Any reason why these three girls, A[.], Y[.], and G[.] would have to lie about Mr. Meza?
>
> "I want you to give some hard thought to that. In the deliberation room, if any of your fellow jurors raise doubts about Y[.] and G[.] and A[.], I want you to think to yourself and I want you to offer to the group, what's their motive to lie? What's the reason they have to lie about this man?
>
> "What's in it for the victims? Here's what's in it for the victims. They go to therapy to talk to a stranger about their problems. And anyone who has gone to counseling here knows that counseling isn't a pleasant experience. How would it be as an experience for someone who actually wasn't traumatized. Would someone who wasn't traumatized go to the efforts of going to therapy for no reason?
>
> "What's in it for the victims? How about SART exams? You get to go see a stranger like Mary Ritter who's going to take pictures of your vagina and your anus. That's the reward you get for coming forward. [¶] Traveling from Modesto to San Jose multiple times to attend court appearances over the years, talking about oral sex, digital penetration, and sodomy by a family member in front of strangers. [¶] . . . [¶]

34

"These girls aren't going to want to discuss oral sex, digital penetration, and sodomy by their uncle in front of a group of total strangers if it's not true. [¶] . . . [¶] They're being called liars. [¶] . . . [¶] Did they do all of these things just to carry out a lie as the defense would have you believe?"

The prosecutor further argued:

"In your deliberations, I'm asking to you [*sic*] use your common sense. Don't let the defendant get away with this just because he brought this a slew of his family members to vouch for him. They weren't behind the closed doors where these crimes occurred.

"Don't let the defendant get away with this just because his guilt depends on the word of three girls. They were the most credible witnesses in this case. Don't let the defendant get away with this just because he chose the perfect victims.

"When you become a juror, we don't ask you to check your common sense at the front doors of the courthouse. To the contrary, we ask you to bring your common sense inside and use it during deliberations.

"Somehow though, when we get inside the courtroom and start hearing attorneys arguing about legal arguments and other theories, we start thinking about things upside down. Only in a courtroom could someone look at you with a straight face and suggest to you that three girls who have no motive to lie say that the defendant molested them and he not did do it. (*Sic*.)

"I venture to say that if you stepped outside of the courtroom and read about this case in the newspaper, you would quickly come to the conclusion that the defendant is guilty of child molestation.

"Your analysis should not be any different just because you're inside the courtroom.

"Common sense is seeing things as they are and doing what should be done. Use your common sense to see that the

35

defendant is guilty of these crimes. Do what ought to be done and return a guilty verdict."

Defense counsel argued the jury should "[u]se [their] common sense. We can all think of examples where a small slight leads to huge reactions. We can all think of examples where a focused lie, a smaller lie, gets bigger and bigger and out of control."

The prosecutor later argued in rebuttal:

> "What is reasonable doubt? Reasonable doubt is this: First off, whether you believe it or not, the law says you can never really know anything for sure; right? What does the jury instruction say itself, 'The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.' [¶] So you can never know something for sure under the law, so certainty is not required. What is required? 'Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.'

> "What does that mean? Conviction means belief. Abiding means lasting. You need a lasting belief that the defendant did these crimes. What does that mean? It means that after you reach your guilty verdict and you go home at night, you have that belief still. In the next week, you continue to have that belief. And in months and years from now, although you will never know anything for sure, you still have the belief that he did these crimes.

> "That's what's required under the law."

B. *Governing Legal Principles*

" ' "To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm" ' " (*People v. Sattiewhite* (2014)

36

59 Cal.4th 446, 480 (*Sattiewhite*)), or an objection would have been futile (*People v. Centeno* (2014) 60 Cal.4th 659, 674).

" ' "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*Sattiewhite*, *supra*, 59 Cal.4th at p. 480.) Misconduct that falls short of this standard may nonetheless violate state law if it "involves the use of deceptive or reprehensible methods to persuade the court or jury." (*People v. Watkins* (2012) 55 Cal.4th 999, 1031 (*Watkins*).)

A prosecutor need not act in bad faith to commit misconduct, but the defendant must have been prejudiced as a result. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214 (*Bolton*).) The standard for determining whether a defendant is prejudiced depends on the type of error involved: "Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334 (*Rivera*); see *Chapman v. California* (1967) 386 U.S. 18, 24; *Watson, supra*, 46 Cal.2d at p. 836.)

C. *Analysis*

Meza raises three claims of misconduct regarding the prosecutor's closing argument. Each of these claims was forfeited and lacks merit.[15]

### 1. *The prosecutor did not mischaracterize the burden of proof*

Meza contends the prosecutor mischaracterized the burden of proof and misconstrued the reasonable doubt standard when he stated, "I venture to say that if you stepped outside of the courtroom and read about this case in the newspaper, you would quickly come to the conclusion that the defendant is guilty of child molestation. [¶] Your analysis should not be any different just because you're inside the courtroom."

Meza neither objected to this statement nor requested an admonition. He therefore forfeited the argument.[16] (*People v. Potts* (2019) 6 Cal.5th 1012, 1035 ["we have repeatedly applied our ordinary forfeiture rule to claims that a prosecutor misstated the reasonable doubt standard"].)

Meza's claim also fails on the merits. When a claim of misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied

---

15    Meza contends that counsel provided ineffective assistance if he failed to preserve all of Meza's claims of prosecutorial misconduct. We reject this contention because we conclude there was no prosecutorial misconduct that would have provided a basis for a successful objection. (*People v. Boyette* (2002) 29 Cal.4th 381, 437 (*Boyette*) ["[D]efense counsel cannot be considered ineffective for failing to make groundless objections or for failing to make objections to misconduct causing defendant no harm."].)

16    Prior to trial, defense counsel moved in limine to "prohibit[] the prosecution from analogizing everyday decision making to the standard of proof beyond a reasonable doubt." The trial court granted the motion, but on multiple occasions cautioned the attorneys to object during trial to a perceived violation of a pretrial ruling.

any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  Contrary to Meza's assertion, there is no reasonable likelihood the jurors would have construed the prosecutor's remarks as lowering the burden of proof.  The prosecutor merely argued that the jurors were not required to abandon their common sense during their deliberations.  (See *Boyette*, *supra*, 29 Cal.4th at p. 437 [no misconduct where prosecutor argued that the evidence of guilt was so strong that if any juror had any doubts, they should " 'step back, take a deep breath [and] think about [their] common sense' "].)  The prosecutor's comment about the ease with which the jury could reach its verdict "would reasonably be considered by the jurors as comment on the overwhelming evidence of guilt supporting those charges, not as an improper suggestion that the jurors need not be convinced of defendant's guilt" beyond a reasonable doubt.  (*People v. Thomas* (2012) 54 Cal.4th 908, 939.)[17]  Moreover, rather than singling out a few sentences, to assess misconduct "we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 (*Dennis*).)  After making the comment regarding stepping outside the courtroom, the prosecutor emphasized that the People were required to prove guilt beyond a reasonable doubt and further emphasized that this required " 'proof that leaves you with an abiding conviction that the charge is true.' " (See CALCRIM No. 220.)  In the context of the argument as a whole, the prosecutor's statements did not amount to deceptive or reprehensible

[17]    For this reason, Meza's reliance on *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 is misplaced.  In *Katzenberger*, the prosecutor committed error in using a slide show to display pieces of the Statue of Liberty to illustrate the reasonable doubt standard.  (*Id.* at pp. 1264-1269.) Unlike *Katzenberger*, the prosecutor here was not inviting the jury "to guess or jump to a conclusion" regarding the defendant's guilt.  (*Id.* at p. 1267.)

methods of persuasion (*Watkins*, *supra*, 55 Cal.4th at p. 1031) and they did not infect the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process (*Sattiewhite*, *supra*, 59 Cal.4th at p. 480).

### 2. *The prosecutor did not improperly malign defense counsel*

Meza contends the prosecutor improperly maligned defense counsel by stating that the three complaining witnesses were "being called liars" by the defense and that "[o]nly in a courtroom could someone look at you with a straight face and suggest to you that three girls who have no motive to lie say that the defendant molested them and he [did not] do it."

This claim of misconduct was forfeited by counsel's failure to object and request an admonition. (*People v. Williams* (2016) 1 Cal.5th 1166, 1187-1188 (*Williams*) [defendant forfeited claim that prosecutor committed misconduct by denigrating defense counsel].)

The claim also lacks merit. "Personal attacks on the integrity of opposing counsel can constitute misconduct. [Citation.] 'It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.' [Citation.] However, 'the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 484 (*Winbush*).) In this case, the prosecutor did not suggest defense counsel was deceiving the jury, and did not attempt to divert the jury's attention to irrelevant matters. Instead, the prosecutor referenced the evidence—A. and Y.'s testimony detailing sexual abuse they suffered at the

hands of Meza—and the reasonable inferences and deductions from that evidence. "A prosecutor may make fair comment on the state of the evidence" (*People v. Cook* (2006) 39 Cal.4th 566, 608), " 'which can include reasonable inferences, or deductions to be drawn therefrom.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

Meza contends the prosecutor's statements are akin to the improper statements in *People v. Herring* (1993) 20 Cal.App.4th 1066. In that case, the reviewing court found it was reversible error for the prosecutor to say that defense counsel's clients were all " 'rapists, murderers, robbers [and] child molesters,' " and that defense counsel "tells [them] what to say" and argues for their innocence even though he knows they are guilty. (*Id.* at p. 1075.) The objectionable statements in *Herring* were not based on evidence in the record; rather, they implied defense counsel fabricated evidence and "malign[ed] defense counsel's character." (*Ibid.*, citing *People v. Thompson* (1988) 45 Cal.3d 86, 112.) By contrast here, the prosecutor was commenting on the state of the evidence and refuting the defense's claim that the victims fabricated their testimony. Because the prosecutor was not maligning Meza's counsel, there was no misconduct. (See *Williams*, *supra*, 1 Cal.5th at p. 1189 [rejecting claim of prosecutorial misconduct where the prosecutor's "comments did not cast aspersions on defense counsel or imply that he was dishonest," but rather focused on the weaknesses in the defense]; *People v. Charles* (2015) 61 Cal.4th 308, 328-329 [rejecting claim of prosecutorial

misconduct where comments were "aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally"].)[18]

3. *The prosecutor did not improperly vouch for the witnesses*

Meza contends the prosecutor improperly vouched for prosecution witnesses by focusing on the lack of a motive to lie and drawing attention to hardships the victims endured throughout the criminal case. As summarized *ante*, the prosecutor argued the jury should reject the "[u]nreliable" testimony of defense witnesses, and should instead rely on the testimony of the victims consistent with the "single witness rule." After summarizing the evidence supporting the elements of the charged offenses, the prosecutor again referred to the single witness rule and rhetorically asked "what's [the victims'] motive to lie? Did you hear any evidence of a motive to lie in this case? Any reason why these three girls, A[.], Y[.], and G[.] would have to lie about Mr. Meza?" After asking "[w]hat's in it for the victims," the prosecutor referenced A. and Y.'s testimony regarding "go[ing] to therapy to talk to a stranger about their problems" (something that "someone who actually wasn't traumatized" need not endure), undergoing a SART exam requiring "pictures of your vagina and your anus" as "the reward [the victims] get for

18    The remaining cases cited by Meza are similarly distinguishable. (See, e.g., *People v. Hawthorne* (1992) 4 Cal.4th 43, 59-61 [suggesting defense counsel was obligated or permitted to present a defense dishonestly]; *People v. Perry* (1972) 7 Cal.3d 756, 789 [prosecutor attacked defense counsel by suggesting "defense counsel were not ethically obligated to present the facts and so were free to obscure the truth and confuse the jury"]; *People v. Bain* (1971) 5 Cal.3d 839, 847 [prosecutor implied without support "that defense counsel fabricated a defense" and "[a]fter the judge said that defense counsel was not 'drumming up any stories,' the prosecutor compounded his own misconduct by quipping, 'if that shoe fits, he can wear it' "].) Again, the prosecutor here was not denigrating counsel but rather stating that the defense's position lacked merit based on the evidence presented.

coming forward," and traveling to attend court where they were required to "talk[] about oral sex, digital penetration, and sodomy by a family member in front of strangers." The prosecutor stated: "What are the odds that multiple girls would accuse the defendant of molesting them and he didn't do it? [¶] . . . [¶] Don't let the defendant get away with this just because his guilt depends on the words of three girls. They were the most credible witnesses in this case."

Meza did not object to these statements at trial and therefore failed to preserve his claim for appeal. (*People v. Mendoza* (2016) 62 Cal.4th 856, 906 [defendant forfeited claim of improper vouching].)

Meza's claim of improper vouching also lacks merit. " 'Prosecutorial assurances, *based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper "vouching," which usually involves an attempt to bolster a witness by reference to facts *outside* the record.' " (*People v. Williams* (1997) 16 Cal.4th 153, 257; see *People v. Bonilla* (2007) 41 Cal.4th 313, 335-338 [prosecutor's statements regarding witness's truthfulness, including remarks about what "we know from everything we have heard," were not misconduct where they did not suggest the prosecutor had personal knowledge of facts outside the record]; cf. *Rivera, supra*, 7 Cal.5th at p. 335 [" ' "[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." ' "].)

Rather than referencing facts not in evidence, the prosecutor here referenced the witnesses' testimony. Specifically, Norma testified that she took the girls to therapy after they made disclosures regarding sexual abuse, and A. testified that, even after years of therapy, she still felt uncomfortable talking about these subjects in a room full of people. A physician assistant

43

testified about conducting A.'s and Y.'s SART examinations and the results of those examinations. A. testified that she and Y. had moved out of the county since disclosing the sexual abuse, and both A. and Y. testified as to the sexual abuse Meza forced them to endure. Based on this evidence, the prosecutor argued it made no sense for the victims to fabricate their claims—as suggested by the defense—and unnecessarily go through these experiences. The prosecutor did not improperly vouch for the witnesses' credibility by pointing out flaws in the defense theory that A. and Y. fabricated their claims. (See *People v. Rodriguez* (2020) 9 Cal.5th 474, 480 [a prosecutor does not improperly vouch for a witness merely by asking the jury, " ' "What motive would [the witness] have to lie?" ' "]; *People v. Frye* (1998) 18 Cal.4th 894, 971 ["[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be

characterized as improper vouching."], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)[19]

### 4. *There was no cumulative error or prejudice*

Meza contends that the cumulative effect of the prosecutor's statements rendered his trial fundamentally unfair. We have concluded the prosecutor's statements were not improper and thus conclude Meza's argument of cumulative error lacks merit. (*Winbush, supra*, 2 Cal.5th at p. 487.)

Even assuming the challenged statements were improper, they were harmless. (*Rivera, supra*, 7 Cal.5th at p. 335.)[20] As previously noted, we "view the statements in the context of the argument as a whole." (*Dennis, supra*, 17 Cal.4th at p. 522.) The statements Meza singles out were brief

---

[19] In the section of his brief claiming improper vouching, Meza contends the prosecutor's argument "could also be construed as an improper appeal to the jury's sympathy." (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [prosecutor's request that the jury think about what the rape-murder victim "must have been thinking in her last moments of consciousness during the assault" was an improper appeal for sympathy for the victim, which "is out of place during an objective determination of guilt"], reversed on other grounds in *Stansbury v. California* (1994) 511 U.S. 318.) Meza forfeited this argument by failing to raise it under a separate heading in the opening brief. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4.) We also reject Meza's claim on the merits. The prosecution here was commenting fairly on the evidence of the victims' experiences. "It did not overtly encourage jurors to base their verdicts on passion or emotion." (*People v. Leon* (2015) 61 Cal.4th 569, 606.)

[20] Because Meza has not established any federal constitutional error, we apply the *Watson* standard and determine if there is a "reasonable probability that the jury would have reached a more favorable result absent the objectionable comments." (*People v. Sandoval* (1992) 4 Cal.4th 155, 184; *Watson, supra*, 46 Cal.2d at p. 836; see *Bolton, supra*, 23 Cal.3d at p. 214, fn. 4 ["Courts of this state have generally assumed that prosecutorial misconduct is error of less than constitutional magnitude."].)

comments in the midst of an argument that spanned the course of two days. The prosecutor extensively argued the facts of the case and accurately summarized the extensive and compelling evidence against the defendant. The jurors were instructed that they were required to "decide what the facts are," "based only on the evidence that has been presented to you in this trial," "[n]othing that the attorneys say is evidence," the attorneys' "arguments" and "remarks are not evidence," and "[o]nly the witnesses' answers are evidence." (See CALCRIM Nos. 200, 222.) We presume the jury followed these instructions. (*People v. Harris* (1994) 9 Cal.4th 407, 426.) Given the strength of the evidence, and the detailed instructions focusing the jury on the evidence rather than the argument of counsel, we conclude that the prosecutor's challenged comments were harmless. (See *McDowell*, *supra*, 54 Cal.4th at p. 438 ["the trial court's instructions rendered any conceivable [prosecutorial] misconduct harmless"].)

III.

*Nondisclosure of Privileged Therapy Records*

A. *Additional Background Information*

Prior to trial, Meza subpoenaed records from A.'s and Y.'s therapists. He argued that inconsistencies in the witnesses' testimony indicated that their stories changed significantly after therapy began. While the prosecution characterized the girls' progressive statements as incremental disclosures, Meza characterized the statements as inconsistent and argued they undermined the girls' credibility. Meza argued disclosure of the girls' therapy records would be warranted if there was "strong impeachment evidence within the content of those files."

To assess whether the therapy records should be disclosed, the trial court reviewed the records in camera along with the preliminary hearing

transcripts. The trial court ultimately found "there was nothing worthy of disclosure." The court's order declining disclosure concluded: "I find no record in either set of records that '[is] essential to vindicate the defendant's constitutional right' [citation] [to a defense or—out of an abundance of caution although it is not clearly required by case law—to prepare for a defense]."

Meza requested that this court independently review A.'s and Y.'s therapy records to determine whether the trial court's decision declining to disclose the records to the defense was proper. The Attorney General did not oppose this request.

B. *Analysis*

"Evidence Code section 1014 generally privileges confidential communication between a patient and his or her psychotherapist." (*People v. Dworak* (2021) 11 Cal.5th 881, 912 (*Dworak*).) "Under [*People v. Hammon* (1997) 15 Cal.4th 1117], psychiatric material is generally undiscoverable prior to trial." (*People v. Gurule* (2002) 28 Cal.4th 557, 592 (*Gurule*).) "When a defendant proposes to impeach a crucial prosecution witness with questions that call for privileged information, the trial court must balance the defendant's need for cross-examination against the state policies that the privilege is intended to serve. The court should consider the prosecution evidence, the proffered defense as presented in opening statements, cross-examination of the prosecution's witnesses, and any other evidence relevant to this determination. If the court finds that there may be good cause for disclosure, the court examines the records in camera and rules on whether and what parts of the records should be disclosed to the defense. Only records essential to vindicate the defendant's constitutional right may be disclosed." (Cal. Criminal Law: Procedure and Practice (Cont. Ed. Bar 2021)

47

§ 11.29; see *People v. Reber* (1986) 177 Cal.App.3d 523, 532 [describing the four steps the trial court should undertake to determine whether disclosure is proper: "(1) obtain and examine in camera all the materials under subpoena, (2) weigh defendants' constitutionally based claim of need against the statutory privilege invoked by the People, (3) determine which privileged matters, if any, were essential to the vindication of defendants' rights of confrontation and (4) create a record adequate to review its ruling"], disapproved on other grounds in *Hammon*, at p. 1123.)

" 'Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable "must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record." ' " (*Dworak, supra,* 11 Cal.5th at p. 912; see *Gurule, supra,* 28 Cal.4th at p. 595 [Supreme Court reviewed withheld psychiatric records even after concluding that any error in failing to disclose them was harmless].) Like the court in *Dworak*, we have reviewed the records in their entirety.[21] (*Dworak*, at p. 912 ["We have reviewed the records and agree with the trial court's assessment that they contain little of any plausible value to the defense."].) We agree with the trial court's

---

[21] On July 15, 2021, this court initially directed the Clerk of the Santa Clara County Superior Court (Clerk) to transmit the two sets of sealed documents from therapists which were reviewed in camera by the trial court and referenced in the trial court's order denying disclosure. On July 30, 2021, the Clerk certified that, after a due and diligent search, the therapy records could not be located. After obtaining supplemental briefing from the parties regarding how to proceed in light of the Clerk's response, on August 26, we directed the trial court to determine whether it could obtain copies of the therapy records and requested that the court make every effort to obtain and transmit the documents to this court. On September 30, the Clerk transmitted a complete copy of the therapy records to this court under seal.

assessment that disclosure of the records was not necessary to vindicate Meza's constitutional rights, and that no other basis existed to disclose the records for Meza's defense. (See *People v. Abel* (2012) 53 Cal.4th 891, 931 [considering whether requested psychiatric records withheld by the trial court were "material," whether nondisclosure might have had "any adverse effect . . . on counsel's investigations and trial strategy," or whether the records "implicate[] the preparation or presentation of defendant's case"].) The trial court did not abuse its discretion in denying Meza's request to disclose the therapy records. (*Dworak*, at p. 912 [reviewing trial court's decision rejecting disclosure of psychological and psychiatric records under abuse of discretion standard]; see *People v. Prince* (2007) 40 Cal.4th 1179, 1232 [" 'The court's ruling on a discovery motion is subject to review for abuse of discretion.' "].)

## DISPOSITION

The judgment is affirmed.

GUERRERO, J.

WE CONCUR:


DATO, Acting P. J.


DO, J.

49